a. The company is under no obligation to pay this separation supplement.

            b. Payment will be made a year at a time at the sole discretion of the Company

            c. The separation payment is made from operating funds and not from any benefit plan funds.

            d. The separation pay is *not* included in pensionable earnings for the purpose of calculating a pension benefit.

            e. The letter should be given to the employee in duplicate, having the employee sign one copy as understanding the terms, and returning the signed copy to the Corporation for file.

4. Employees, age 55 or older at date of termination, will be treated as retired employees with provisions of the Retirement Income Plan applying. Employees in this category who elect to stay with Diamond Shamrock and for whom placement is not accomplished, and who remain employed until notification that their services are no longer needed, will receive the employee benefit provisions described in Section 2 above. Retired Health Insurance and Retired Life Insurance provisions will become operative at the conclusion of the ninety day period.

/s/ W. L. Abele
_____
W. L. Abele

APPROVED:

/s/ C. R. Powell
_____
C. R. Powell

/s/ C. E. Stewart
_____
C. E. Stewart

/s/ G. G. Carlton
_____
G. G. Carlton

**PHOENIX CANADA OIL COMPANY LIMITED, Plaintiff,**

v.

**TEXACO, INC., Texaco Petroleum Company and Ecuadorian Gulf Oil Company, and Gulf Oil Corporation (now, by change of name, Chevron U.S.A. Inc.), Defendants.**

**Civ. A. No. 76–421–JRR.**

United States District Court, D. Delaware.

March 13, 1987.

Thomas D. Hughes, of Hughes & Sisk, Wilmington, Del., Victor F. Muskin, and Sally L. Schneider, of Gruen, Muskin & Thau, New York City, of counsel, for plaintiff.

William O. LaMotte, Jr., and Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Milton Sherman, Myron Kirschbaum, Scott M. Berman, and John W. Schryber, of Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel, for defendants.

## OPINION

ROTH, District Judge.

This is a diversity action, brought more than ten years ago by plaintiff, Phoenix Canada Oil Company Ltd. ("Phoenix"), claiming breach of contract, unjust enrichment, and intentional infliction of economic distress by defendants, Texaco, Inc. ("Texaco"), Gulf Oil Corporation, now by change of name Chevron U.S.A., Inc. ("Gulf"), Texaco Petroleum Company ("Texaco Ecuador"), a Delaware corporate subsidiary of Texaco, and Ecuadorian Gulf Oil Company ("Gulf Ecuador"), a Delaware corporate subsidiary of Gulf. The litigation arose from an agreement ("the 1965 Contract") by which Phoenix and Norsul Oil and Mining, Ltd. ("Norsul") assigned to Texaco Ecuador and Gulf Ecuador the rights to explore for and exploit petroleum reserves in a concession area in eastern Ecuador, in return for a payment of $100,000 plus two percent of the value of net production of crude oil and natural gas.

There have been a number of prior decisions in this case, both reported and unreported, which have narrowed and defined the issues. In *Phoenix I*, 78 F.R.D. 445 (D.Del.1978), the Court considered and denied both defendants' motion to dismiss on the basis of *forum non conveniens* and the doctrines of act of state and foreign government compulsion and plaintiff's motion for partial summary judgment.

In *Phoenix II*, 560 F.Supp. 1372 (D.Del. 1983), the Court took up defendants' motion for summary judgment. On the breach of contract claim, the court granted defendants' motion, ruling that Ecuadorian law applied and that defendants did not breach the 1965 contract when Texaco Ecuador and Gulf Ecuador stopped making the two percent payments on portions of their concession areas which were acquired by the Ecuadorian State Petroleum Corporation ("CEPE").

The Court further ruled in *Phoenix II* that plaintiff's claim, based on the allegation that defendants engaged in a continuing scheme to destroy plaintiff as an economic entity, was barred by the Delaware statute of limitations, 10 *Del.C.* § 1806, since none of the acts which would give rise to a cognizable cause of action had occurred within the three years preceding the filing of suit.

Finally, the Court denied summary judgment on the unjust enrichment claim, holding that Ecuadorian law applied, that there was a reasonable basis to conclude that Ecuadorian law recognized the concept of unjust enrichment, and that there were issues of material fact as to whether CEPE's compensation to Texaco Ecuador and Gulf Ecuador for the acquisition of its interest in the concession area reflected only the depreciated value of assets and equipment, or included compensation for production rights, and, if so, as to whether defendants had received a benefit from the transfer to CEPE.

In *Phoenix III*, C.A. 76–142 (D.Del., July 20, 1984) [Available on WESTLAW, DCT database], the Court ruled that, if an Ecuadorian court were to allow a general unjust enrichment cause of action, the court would apply an action *"de in rem verso"*, which action is comprised of five elements: (1) enrichment of defendants, (2) loss to plaintiff, (3) lack of justification for the enrichment, (4) no other available remedy, and (5) absence of law barring the remedy. *Phoenix III*, slip op. at 11 [Available on WESTLAW, DCT database]. The Court also con-

sidered in this Memorandum Opinion, plaintiff's claim that defendants miscalculated the two percent payments during three quarters in 1973 and 1974. The Court held that there was no miscalculation. However, this latter ruling was vacated on June 11, 1985, and the claim for the three miscalculated quarterly payments was reinstated.

Trial on the claims of unjust enrichment and of underpayment for the three quarterly periods was held in September 1986. The Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The incidents which gave rise to this litigation took place for the most part in Ecuador, a South American country which straddles the Equator. Ecuador has three major geographic regions: the lowlands of the Pacific coast, the Andes highlands where the capital, Quito, is located at an elevation of 9,200 feet, and the Oriente or eastern lowlands, a sparsely populated area, including the eastern slopes of the Andes and part of the Amazon River basin.

There had been unsuccessful exploration for oil in the Oriente in the 1920's and the 1940's. Oil exploration began again in the region in 1961. In July 1961, the Government of Ecuador granted a concession to Minas y Petroleos del Ecuador ("Minas")[1] to explore for petroleum reserves and to exploit them, if discovered, in 4,350,000 hectares (approximately 10,744,500 acres or 16,788 square miles) in the Napo, Pastaza, and Morona Santiago provinces of the Oriente region ("1961 Concession"). The grant of the 1961 Concession to Minas by the Government of Ecuador was authorized by Decree 1401, which set out the terms and conditions of the concession contract (the "1961 Contract").

Plaintiff Phoenix's involvement with the Ecuadorian concession goes back to 1961 when one Howard Steven Strouth approached S. Donald Moore, president and sole operating officer of Phoenix, in order to acquire a public company to facilitate the financing of Minas's operations. Moore introduced Strouth to the principals of a small Canadian corporation, then dormant. Strouth's group acquired a controlling interest in that company, Norsul Oil and Mining, Ltd. Minas then became Norsul's wholly owned subsidiary. From 1961 to 1971 Strouth was Norsul's major stockholder, Managing Director, and principal operating officer.

Phoenix did not itself contribute to Minas's operations in 1961. However, in 1963, Strouth again approached Phoenix to become a participant in the venture. He met with Moore in Calgary in early 1963. As a result of that meeting, Phoenix agreed to contribute certain funds to the maintenance of the concession area and further agreed that Moore would contribute oil industry expertise to Norsul, all in consideration of an undivided 30 percent interest in the concession area. According to Moore, Phoenix's interest was later increased to 60 percent.[2]

The 1961 Contract required that Minas make certain minimum yearly investments for exploration and exploitation operations and that it pay annual surface taxes. Minas did not have the capital to undertake an extensive exploration program in the area. Instead, Strouth hoped to interest a large oil company in purchasing the concession from Minas. Because Minas failed to do the required exploratory work, was habitually in arrears in meeting its financial obligations, and engaged in speculative activities, the 1961 Contract was in danger during the early 1960's of being cancelled by the Government of Ecuador.

In 1964, defendants Gulf and Texaco, through Ecuadorian subsidiaries, also became involved in exploring for oil in the Oriente. The Government granted them the Napo Concession, which adjoined the Minas 1961 Concession on the north. During 1964 there were contacts between Minas and defendants concerning the possibility of a joint survey of the boundary between the Minas and Napo concessions and

---

**1.** Minas was organized as a corporation under the laws of Ecuador in 1960.

**2.** T–212 (Trial Transcript is designated "T" plus page number).

the acquisition by defendants of part of the Minas concession.

In January 1965, Moore arranged with Max Crawford of Texaco to meet in Trinidad to discuss a new proposal for participation by defendants in the Minas 1961 concession. Moore met with one of Texaco's principal geologists, a Mr. Martin, on January 27 to present a proposal for Gulf and Texaco to acquire a portion of the 1961 Concession. Moore took the position that because Phoenix owned 60 percent of Minas, he was the person with whom to negotiate concerning the 1961 Concession. Strouth at the same time contended that Norsul owned all the shares of Minas and that he was the one to deal with. After looking into the matter, Texaco decided to negotiate with Strouth.

Strouth had moved to Quito as a result of a condition imposed by Phoenix when it began its participation in the Minas 1961 Concession venture. In early 1965, Strouth began discussions in Quito with representatives of Texaco. On April 1, 1965, Max Crawford made an offer by letter on behalf of Texaco and Gulf to acquire from Minas 500,000 hectares of the 1961 Concession in return for a cash payment plus an overriding royalty for any production developed and exploited. This transaction would be subject to the approval of the Government of Ecuador.[3]

On July 16, 1965, Compania Texaco de Petroleos del Ecuador, C.A. ("Texaco del Ecuador"), an Ecuadorian subsidiary of Texaco Ecuador, and Gulf Ecuatoriana de Petroleo, S.A. ("Gulf Ecuatoriana"), an Ecuadorian subsidiary of Gulf Ecuador, contracted with Minas to acquire a portion of Minas's interest in the 1961 Concession. This area, comprising 650,000 hectares directly south and east of the Napo Conces-sion, has become known as the Transfer Zone or the Coca Concession. Moore did not participate in the negotiation of this contract (the "1965 Contract"). Strouth, not Moore, signed the contract on behalf of Minas.

The 1965 Contract provided that Minas assign its interests in the Transfer Zone to Texaco del Ecuador and Gulf Ecuatoriana, or their designees, in exchange for a payment of $15,000 at the signing of the contract and a further $85,000 when the Government of Ecuador approved the transfer and for payments, when and if exploitation of oil began in the Transfer Zone, of two percent of the value of net production of all crude oil and natural gas from the area.[4]

The transferees sought approval of the assignment by the Government of Ecuador by presenting to the government a document executed by Minas along with a proposed instrument of conveyance. These two documents were designated Attachments No. 1 and 2 to the 1965 Contract. Attachment No. 1, the instrument of conveyance, recited the consideration for the transfer as $15,000. No mention is made in either attachment of the $85,000 or the two percent payments. The 1965 Contract itself was not submitted to the Government in connection with the request for approval of the conveyance.[5]

The Government of Ecuador issued its approval of the transfer on December 20, 1965, in Resolution No. 844.

In January 1969, defendants publicly announced the first oil discovery in the Transfer Zone. Actual production began in about May 1972. In order, however, to transport the Oriente crude out to market, it was necessary to build a pipeline over the Andes mountains, down to the Pacific

---

3. PTX 4 (Plaintiff's Trial Exhibits are designated "PTX"; Defendants' Trial Exhibits, "DTX".)

4. DTX 12A. The remainder of Minas's 1961 Concession was declared forfeit by the Government of Ecuador on February 27, 1973.

5. When in 1973 the then-Minister of Natural Resources and Energy, Jarrin, learned of the terms of the 1965 Contract, particularly the two percent payments, he considered the contract irregular and the two percent payments an illegal division of the resources of the sub-soil, which belonged to the State. Jarrin wanted any such payments to be declared null and void. Instead, the Government of Ecuador imposed an 86 percent tax on them. Jarrin D52–54, 61–64. (Deposition references are designated by the name of the deponent with "D" plus the page number.)

coast. Texaco Ecuador and Gulf Ecuador designed and built the 318 mile pipeline, the highest major pipeline in the world, at a cost of $108,000,000.

In June 1969, within seven months of the discovery of oil in the Oriente region, the Government of Ecuador required renegotiation of the concession contracts. Decree 1324, issued on June 26, 1969, significantly changed the terms of the contract regulating exploitation of the Transfer Zone and Decree 1323, those of the Napo Concession. Each concession was reduced to 500,000 hectares in size, which took 150,000 hectares from the Transfer Zone and 900,000 hectares from the Napo Concession. Defendants were permitted to select the areas to give back; however, they were not compensated by the Government for the areas relinquished or for the rights to explore for and produce crude oil in those areas. In addition, Decree 1324 raised the royalties paid to the Government on Transfer Zone oil from 6 percent to 11.5 percent.[6]

On September 27, 1971, the Government of Ecuador enacted a new hydrocarbons law (the "1971 Law"), which replaced the 1937 Petroleum Law.[7] Article 1 of the 1971 Law set out the basic concept of the Government of Ecuador, concerning the petroleum resources in Ecuador:

> The deposits of hydrocarbons and accompanying substances, in whatever physical state, located in the national territory, including the areas covered by territorial sea water, belong to the inalienable and imprescriptible patrimony of the State.[8]

The 1971 Hydrocarbons Law, as originally promulgated, did not apply to contracts already in existence. It provided for much more onerous terms to be incorporated in concession contracts executed after it became effective. These provisions included a maximum concession area not to exceed 200,000 hectares, with the exploitation area not to exceed 160,000 hectares, a surface tax starting at 10 sucres a year per hectare (.40¢) and rising, after five years of exploitation to 100 sucres per hectare ($4),[9] and a government royalty of 16 percent. The new law permitted the Government to compute royalties and income taxes by a "reference price" which would be uniform for all producers. The reference price would be set by agreement with the producers or unilaterally by the Government. Factors such as the grade of the oil, the condition of the Ecuadorian oil industry, world market conditions, other countries' reference prices, transportation costs, and other pertinent factors would be taken into account in setting the reference price. The 1971 Law specifically provided, however, that if the actual sales prices were ever higher than the reference price, the assessments would be calculated on the basis of the actual sales price.[10]

The 1971 Law also provided for Government participation in oil production by means of "association contracts" under which CEPE would be a party.

In February 1972, a military government took power in Ecuador. The head of the new government, General Guillermo Rodri-

---

6. The Government had originally sought in January 1969 to raise the royalty to 15 percent. PTX 287. In June 1965, Crawford of Texaco stated in a memo to the Texaco Chairman, in which he was discussing the conveyance to defendants of the Transfer Zone, that he expected that the Government of Ecuador, before it approved the transfer, would insist upon renegotiation of many of the terms of the Minas Contract as it applied to the area to be acquired by Texaco. The likelihood of renegotiation appeared, therefore, to have been recognized by defendants even before the discovery of oil.

7. The 1961 Concession and the 1965 Contract had come into effect under the provisions of the 1937 Petroleum Law.

8. DTX 40B.

9. DTX 40B, Chap. V., Art. 43, 45. This compares to a surface tax under the 1961 Concession Contract starting at $4000 for the 4,350,000 hectares (less than .1¢ per hectare) and rising after eight years to $16,000 (.37¢ per hectare).

10. DTX 40B, Chap. VII, Art. 65. Under the 1961 Concession Contract, the Government royalty was computed on the world market price of a similar grade of Texas crude, plus the pipeline tariff for Texas crude to the nearest exporting port, minus the cost of transporting Ecuadorian crude from Guayaquil to the port of New York, and minus the cost, including depreciation of plants, pipelines and equipment, of transporting crude from the Oriente to Guayaquil, DTX3B, Cl. 26.

guez Lara, appointed Navy Captain Gustavo Jarrin Ampudia to be Minister of Natural Resources and Energy. Captain Jarrin served as Minister from February 1972 until October 1974. During that time he established the oil policies of the Government of Ecuador and was responsible for implementing them.

The military government continued to adhere to the belief of its predecessors that the deposits of hydrocarbons were the inalienable and imprescriptible patrimony of the people of Ecuador. To ensure greater participation of Ecuador in the exploitation of its petroleum reserves, however, the military government turned from the predecessor Ibarra government's policy of prospective participation and enacted means to implement participation in pre–1971 Law concessions. By Supreme Decree 430,[11] issued on June 6, 1972, the military government ruled that the 1971 Law would be retroactively applied to all concession contracts entered into before that law was promulgated. All such concessionaires were required by Clause Sixth of Supreme Decree 430 to "sign new contracts, within a year counted from the enactment of this Law, of a single type, and which shall be similar for all." Supreme Decree 430 also required companies, which were in the exploitation period of their contract and which held more than the maximum concession area allowed by the 1971 Law, to return 60 percent of the area in excess of the maximum.[12] The return of acreage was to be in the shape of rectangles with a surface of no less than 20,000 hectares. Finally, Supreme Decree 430 provided in Clause Seventh that the "Minister of Natural Resources and Tourism, shall declare caducity (forfeiture) of the contract of the concessionaires ... that would oppose either totally or partially the application of these provisions...." Because of this caducity provision, defendants, who had invested some $260,000,000 in Ecuador and who were just at the production start-up point, did not challenge the legality of Supreme Decree 430.

As required by Supreme Decree 430, defendants relinquished substantial acreage to the Government at the end of December 1972. Because the area returned had to be in rectangular blocks of 20,000 hectares, some of that acreage contained proven reserves or wells which had tested for oil. CEPE exploited the profitable portions of the relinquished area and by 1982 was producing at least 20,000 barrels of oil a day from them. The Government of Ecuador did not compensate defendants for the reserves, the rights or the future production or profits they were required to relinquish. In January 1973, defendants requested indemnification from the Government for the area that was turned back. The request was rejected. Minister Jarrin announced that:

> The return of areas to the Ecuadorian State corresponds to the application of the Hydrocarbons Law and of the Supreme Decree Number 430, which safeguard the inalienable interests of the Nation....
>
> [T]he Ministry of Natural Resources declares in a definite and emphatic way that it does not accept nor shall accept any request for indemnification because it is not covered by the legal provisions in force nor by the petroleum policy encouraged by the Nationalistic and Revolutionary Government of the Armed Forces.[13]

In the meantime, with commercial production of oil from the Transfer Zone imminent, questions concerning the two percent payments under the 1965 Contract needed to be resolved. First of all, in 1967 Phoenix had filed a lawsuit against Norsul in the Province of Alberta, Canada, seeking a judicial determination of Phoenix's percent-

---

**11.** Under Ecuadorian law, a "Supreme Decree" is issued by a president who has dictatorial authority with legislative, as well as executive powers. Supreme Decrees have the characteristics of law, prevailing over all other provisions of public or private law, which they may oppose. DTX 47B, Art. 2; T–1865–1866.

**12.** DTX 47B, Cl. 2. Under Article 19 of the 1971 Law, the maximum acreage allowed during the exploitation period was 160,000 hectares. DTX 40B.

**13.** DTX 347.

age interest in the two percent payments and in Minas. In addition, between 1965 and 1971, Strouth had filed in the courts of Ecuador a series of instruments assigning Minas's interest in the two percent payments to Petromin, S.A., and West Coast Petroleum, Inc., entities controlled by Strouth.[14]

In 1971, a group of investors from Albany, Georgia, bought Norsul from Strouth for $130,000, plus four non-interest bearing notes of $55,000 each. Also, in August 1971 Phoenix settled its lawsuit against Norsul by dividing all of Norsul's assets in Ecuador, including the two percent payments, equally between Phoenix and Norsul. When the two percent payments began, Norsul and Phoenix would each receive half, or one percent.

In October 1971, C. Dixon Oxford, the new president of Norsul, and B.C. Gardner, an attorney and vice president of Norsul, contacted Texaco in order to obtain an acknowledgment of some type from Gulf and Texaco that Norsul and Phoenix were the owners of the royalty on the Transfer Zone. The Norsul representatives were told that Texaco would be willing to discuss how such problems would be worked out so as to leave a clear record regarding payment of the royalty.

A meeting was held at Texaco corporate headquarters in New York City on November 9, 1971, between Norsul, Phoenix, Gulf and Texaco to work out the title documentation which Texaco and Gulf would require before they would make the two percent payments to Phoenix and Norsul. Moore met with Texaco representatives in New York on December 15, 1971, again to determine what documentation Texaco wished to receive in connection with Minas's interests. By June 23, 1972, defendants appeared to be satisfied that Phoenix and Norsul had produced adequate documentation to support their claim that they were now the owners of the two percent production payments.

Defendants also came to the conclusion that the price for calculating the two percent payments had to be renegotiated with Norsul and Phoenix. A November 22, 1972, Texaco memorandum reflected this position: that the original contract provision had been frustrated since the "government royalty", which was the basis for calculating under the 1965 Contract, had been a bilaterally established reference price and the amount of the government royalty was now unilaterally set by the Government of Ecuador. A meeting of Texaco, Gulf and Norsul representatives was held at Texaco's Coral Gables, Florida, office on November 27, 1972, to discuss this issue. An agreement to set a new basis for the two percent payment for a period extending through March 31, 1973, was reached by those present. A copy of the agreement was mailed to Moore. After much further discussion, in early 1973 an Interim Agreement was arrived at for the last two quarterly payments of 1972 and the first quarterly payment of 1973. The Interim Agreement specifically provided that the parties were not waiving any rights under the 1965 Contract. The Agreement was executed by Phoenix as of February 5, 1973, and by Norsul, Texaco and Gulf as of February 7, 1973.

---

**14.** Moore, in a November 12, 1971, letter to Texaco, described Strouth's activities in filing these assignments as "paper-hanging." DTX 41. Moore, in a February 19, 1973, letter to Texaco, further portrayed Strouth's activities as "the unfortunate actions of our mutual Quito nemesis." DTX 82. Moore, in his trial testimony, expanded on this description:

> What unfortunate actions were you referring to, Mr. Moore?
> A. Mr. Strouth was a local character who received considerable publicity by way of his dress, including a monocle and a cape, by way of his pronouncements, by way of his parties, by way of his high profile, which

caused problems, if there were any problems, in the matter of his actions, yes.

Q. Among the unfortunate actions of Mr. Strouth were statements he made that antagonized Government officials, particularly those in the Ministry of Natural Resources; correct?

A. I wouldn't say particularly. He antagonized everybody he came in contact with. T–380.

Minister Jarrin particularly disliked and distrusted Strouth, considering him to be corrupt and to be profiting irregularly from the petroleum wealth of the State.

Immediately after the Interim Agreement was signed, Texaco notified Phoenix and Norsul that its Quito office was being instructed to make the two percent payments for the third and fourth quarters of 1972. At this point, however, Minister Jarrin became aware of the two percent payments. On February 22, 1973, Jarrin wrote to the Minister of Finance, requesting that the two percent payments be prohibited:

[A]s it is known that the percentages agreed upon as a kind of royalty have no legal basis whatsoever and have not yet been satisfied by those subject to the obligations, I am requesting you to take the appropriate measures to recover the revenues due the Nation and to study the means for issuing a Special Decree, which would leave without effect the percentages illegally agreed upon and to dispose of those funds for purposes which best serve the country.[15]

On February 23, 1973, Jarrin instructed defendants to suspend any payment of the two percent to Phoenix and Norsul.

Jarrin did not succeed in having the two percent payments cancelled or confiscated. However, the outcome was close to this result. On May 29, 1973, Decree 602 was issued, placing an 86 percent tax on all income generated by premiums, percentages or other kinds of participations given for assignments or transfers of mining or hydrocarbon concessions. The tax was retroactive to include past payments.

After the promulgation of Decree 602, Texaco Ecuador and Gulf Ecuador made the 14 percent after-tax portion of the two percent payments to Phoenix and Norsul for the third and fourth quarters of 1972 and the first quarter of 1973. The 86 percent tax was paid directly to the Development Bank, pursuant to Decree 602.

The parties agreed to extend the provision of the Interim Agreement to cover the calculation of the two percent payments for the second and third quarters of 1973.

Then, in October 1973, war broke out in the Middle East and world oil prices, as well as the Ecuadorian Government reference price, began to rise dramatically. The parties could not agree on the basis for calculating the two percent payments for the fourth quarter of 1973. At the same time, a new problem appeared which further complicated the resolution of the problems with the two percent payments: the negotiation of new concession contracts, required by Supreme Decree 430.

In February 1973, the Ministry of Natural Resources had presented defendants with the draft of a new Model Contract. This proposed contract did far more than just alter the 1962 Contract to conform to the 1971 Law. It contained certain provisions which were much more onerous and which defendants found unacceptable. These included an option for CEPE to participate in Texaco Ecuador and Gulf Ecuador's operations by purchasing stock at par value. Defendants were strongly opposed to this idea because par value was extremely low. CEPE would acquire its interest for practically nothing. Furthermore, the aim of the Government of Ecuador was to achieve participation in the exploitation and marketing of Ecuador's oil resources, a goal which stock ownership in American corporations would not accomplish. Defendants feared that, as soon as the Government realized this, the Ecuadorians would turn around and force participation on the companies. Texaco Ecuador and Gulf Ecuador would then "have the worst of both worlds": the Government of Ecuador as a stockholder in the company and the Government oil company as a partner in the oil operation.[16]

Other provisions which defendants found to be particularly troublesome were a reduction in the term of the contract, an expansion of "internal consumption crude" to include crude supplied to an Ecuadorian export refinery,[17] and a reference price which was unilaterally set by the Govern-

---

15. DTX 86B.

16. T–1286 (Shields).

17. "Internal consumption crude" had to be sold at a price unilaterally set by the Ministry, which was far below the market price and ultimately even below the royalty paid by defendants to the Government on such crude.

ment, without any requirement that cost or world price be considered.

Minister Jarrin was unwilling to negotiate the terms of the model contract since it was to be promulgated legislatively by decree. Defendants were able to discuss some of the proposed provisions with the Ministry. They did not, however, succeed in adjusting all the problems they foresaw. The Model Contract was published on March 27, 1973, as Decree 317. It no longer provided for CEPE to acquire stock ownership in the operating companies. Instead, it required concessionaire companies to make a future conveyance to CEPE of an undivided interest in an as yet to be determined percentage of their rights, obligations and properties. Defendants were not able to ameliorate the other troublesome provisions of the model contract.

Texaco Ecuador and Gulf Ecuador would now be required to enter into a new contract, conforming to the Model Contract, for the Transfer Zone. The only negotiation possible would be over a few blank spaces, such as the percentage and starting date of CEPE's participation and the beginning and termination dates of the exploitation period. The new contract would call for a 16 percent royalty which the companies were, in fact, already paying.

Texaco Ecuador summed up the new situation as follows:

> The signing of the new contract will sever our relationship with the old [1961] contract where we had basic essential protection against arbitrary Government rulings. The new contract exposes us to the rulings of the Government which could make the operation uneconomic at any time with almost no recourse. Again, this is now in the form of a law and cannot be avoided without a direct confrontation. We reluctantly conclude it must be accepted and so recommend.[18]

In June 1973, just a few months after the promulgation of the Model Contract, Ecuador became a non-voting member of the Organization of Petroleum Exporting Countries ("OPEC"). It became a voting member five months later. After joining OPEC, the Government of Ecuador considered itself obligated to comply with OPEC policy. Such policies were set out in published resolutions, which provided, for example, that OPEC member nations would endeavor as far as feasible to explore for and develop their hydrocarbon resources directly; that terms and conditions of existing concession contracts would be open to revision at predetermined intervals; that financial provisions of concession contracts which resulted in excessively high net earnings would be open to renegotiation, or if the operator declined to negotiate, excessive amounts of earnings would be estimated by the Government, OPEC Resolution XVI.90; and that all Member Countries would establish negotiations with the oil companies to achieve effective participation by the Member Countries in existing oil concessions, OPEC Resolution XXV.139.

Shortly after Ecuador joined OPEC, the Government, on August 4, 1973, published Decree 925 which set out all the terms and conditions of the new Model Contract which Texaco Ecuador and Gulf Ecuador would be required to enter into, pursuant to Supreme Decree 430 (the "1973 Contract"). The 1973 Contract was signed by Texaco Ecuador and Gulf Ecuador on August 6, 1973.

Clause 52 of the 1973 Contract granted CEPE the option to acquire up to a 25 percent participation in the "rights and actions conferred in the present contract and of the assets conferred in the present contract and of the assets acquired by the contractors for the purpose of this agreement...." The consideration to be paid for this participation was described as "the value of the respective rights, assets and obligations in accordance with the terms and conditions to be determined by the parties." If CEPE elected to exercise its option, "it shall give notice within 90 days prior to June 6, 1977."

The 1973 Contract, by Clause 53, replaced defendants' concession contracts, including the 1961 Contract. It also consolidated the Transfer Zone and Napo Conces-

---

18. DTX 108.

sion areas within its coverage. It included all of the provisions of the Model Contract, which defendants found troublesome, including a tax reference price unilaterally set by the Government, reduction of the exploitation period in the Transfer Zone and an open-ended internal consumption crude requirement.

The Government of Ecuador did not pay defendants any compensation for the oil production or the right to extract oil which was lost by the shortening of the exploitation period. Minister Jarrin testified at his deposition that the Government paid nothing for the reduction in the term of the concession.

> How was the Government going to pay any amount over the wealth of the subsoil which, according to the law, is inalienable, and indescriptable [sic]? It belongs to the State. It did not have to pay anything. It did not have to pay for something that was its own property.[19]

Dr. Luis Arauz, legal adviser to Minister Jarrin, concurred in this opinion:

> It had no reason to pay. It was a mandate of the law. It was an act of full sovereignty so that it did not pay one single cent and it had no reason to do so.[20]

Although the 1973 Contract provided for CEPE to acquire its participatory interest in June 1977, the Government of Ecuador decided to accelerate that participation. On January 2, 1974, Supreme Decree 9 was issued. This decree cited the OPEC policy of achieving government participation in the property of the oil companies and declared that Minister Jarrin would commence negotiations with Texaco Ecuador and Gulf Ecuador "for the purpose of making effective during the course of the present year, the option of participation of CEPE in the 25 percent of the rights conferred in the contract entered into for the exploration and exploitation of hydrocarbons and in the assets acquired by the contractors for purposes of said contract."

Robert Shields, who was Chairman and Chief Executive Officer of Texaco Ecuador at that time, testified at trial that, when Decree 9 came out, he did give consideration to opposing its application to Texaco Ecuador and Gulf Ecuador. He concluded that any such opposition would be "totally counterproductive."

> It would result in, at worst, caducity, and, at best, a decreed participation, probably in excess of the 25 percent, mostly [sic] in excess of 50 percent.[21]

Defendants decided that, in negotiating with the Government of Ecuador for the compensation to be paid for CEPE's 25 percent participation, they would seek payment for 25 percent of the unamortized producing and pipeline assets on the books of Texaco Ecuador and Gulf Ecuador, updated to current value, plus the right to 25 percent of production in the concession area for the period 1974 through 1977, when the CEPE option was supposed to be exercisable under the 1973 Contract.[22] Shields was of the opinion that the Government would pay nothing for rights, but only for unrecovered investment.

Defendants presented their request to the Government to be compensated for unamortized assets at updated book value and for the loss of their rights to 25 percent of the crude produced from the area for the period 1974 to 1977. The Government at the outset informed defendants that CEPE would begin its 25 percent participation on June 6, 1974, whether or not there was an agreement on compensation. June 6 was the second anniversary of Supreme Decree 430, a day of patriotic significance.

Negotiations were not a dialogue. The Government told defendants that they would be compensated for the net book value or the unrecovered actual investment in producing and pipeline assets. Defendants' request to be paid for their lost rights in production for the period 1974–1977 was rejected out of hand. Minister Jarrin set out this position at his deposition:

---

**19.** Jarrin D–41.

**20.** Arauz D–65.

**21.** T–1301.

**22.** T–1302–03.

Q. Did the Government of Ecuador pay any compensation or consideration to the companies Texaco [Ecuador] or ... Gulf [Ecuador] when it decided to accelerate the option for CEPE's participation by three years?

A. No, sir. No. The Government of Ecuador determined and we established this policy in general terms, that we would only pay for the investments in book value, those investments that were not yet amortized.

Q. For what reason or reasons did the Government not compensate Texaco [Ecuador] and ... Gulf [Ecuador] when it accelerated the option for CEPE's participation by three years?

A. Well, a very simple reason. Because the country is the owner of its resources. All of the wealth of the subsoil according to the law, is the inalienable and inprescribable patrimony of the State and no one can—it is the patrimony of the State. This means that it can—it never prescribes, it never ends, and it cannot be alienated. I repeat once again?

Q. Go ahead.

A. I was saying that in accordance with the law, the resources of the subsoil, especially the hydrocarbon resources, are the patrimony—the inalienable and inprescriptable patrimony of the people of Ecuador. This means that it never prescribes and it can never be alienated. And if it was ever alienated, the Government may recover it at any given time....

If I correctly understood the question, the Government of Ecuador, when it enforced the option or put it into force the option for CEPE to enter with 25 percent as participating within the contract signed with the consortium Texaco-Gulf, it determined, as policy, that only it would pay for those investments that were not amortized yet. There was no right to be paid, nor any profit, no benefits foregone of any type. This is a

resource of the subsoil that belongs to the people of Ecuador and to the Government of Ecuador, and it does not have to pay for any benefits foregone or profits in the future to anyone.[23]

Minister Jarrin, in his capacity as Minister of Natural Resources, decided exactly how much the Government would pay Texaco Ecuador and Gulf Ecuador in compensation for CEPE's acquisition of its 25 percent participation, and what it would pay for. As he testified at his deposition: "I was responsible and I implemented oil policy and I established it."[24]

The decision of the Government of Ecuador to pay Texaco Ecuador and Gulf Ecuador only for the depreciated value of their investments in the concession area, reflected the policies and practices of OPEC. According to Minister Jarrin:

We communicated to OPEC of the problem that we had with the companies for the new oil contracts, and we requested this support because we were putting into effect new provisions that had been discussed with OPEC in connection with nationalization of the oilfields throughout the world. And, therefore, it was the OPEC policy that payment would be made only for nonamortized investments. And we requested the support of OPEC to implement this policy in Ecuador.[25]

Dr. Arauz testified at his deposition concerning the same reasoning of the Government in determining what to pay for the acquisition by CEPE of its 25 percent participation: There was no need for discussion within the Ministry; participation would be under the same terms established by OPEC, i.e., payment for the depreciated value of investments; there would be no payment for exploitation rights because the State was the owner of the wealth.[26]

It would have been immoral and it would have been very damaging to the country if the country owns the deposit,

**23.** Jarrin D–47–49.

**24.** Jarrin D–49.

**25.** Jarrin D–57.

**26.** Arauz D–73–77.

the oil. And why is it going to pay for the exploitation of its own wealth.[27]

Q. Dr. Arauz, did the Government of Ecuador pay Texaco [Ecuador] and ... Gulf [Ecuador] for 25 percent of their investment in Ecuador when CEPE obtained a 25 percent participation?

A. The Government of Ecuador paid 25 percent of the investments which are listed in Clause 3 of the Acta.

Q. Now, subsequent to the effective date of the participation, CEPE received 25 percent of the oil produced in the 1973 contract area; is that correct?

A. Yes. This appears in the Acta and this was a fact.

Q. Did the Government of Ecuador buy from Texaco [Ecuador] ... Gulf [Ecuador], the right to receive such oil?

A. The Government of Ecuador and CEPE did not acquire the right because they already had it. The State was the owner. What it paid for was the investments made under the terms which appear in the Acta.

Q. Did the Government of Ecuador buy from Texaco [Ecuador] and ... Gulf [Ecuador] the right to receive possible profits on oil from the 1973 contract area?

[Objection omitted]

A. Ecuador did not acquire or buy this right to have profits. What it bought was what appears in the Acta, the assets.[28]

Robert Shields of Texaco Ecuador, who took part in the discussions with the Ministry about the price CEPE would pay, found that the subject of production rights or interests in the oil reserves could not even be mentioned in the meetings with the Ministry.

They wouldn't even talk to us about what the oil reserves were or the future profits, anything like that. You couldn't even get a conversation. That shut it up and started a tirade if you brought it up.[29]

On June 14, 1974, the Minister, the General Manager of CEPE, and the managers of Texaco Ecuador and Gulf Ecuador signed an Acta (minutes) which set out the terms of CEPE's 25 percent participation in the "rights and assets of the Consortium Texaco-Gulf." The price paid by CEPE was to be determined by investments and costs of equipment and materials, from which would be deducted amortization and depreciation. The exact amount of this price was to be established by an independent audit.[30]

The international accounting firm of Peat, Marwick, Mitchell & Co. ("PMM") was selected by CEPE to perform the audit. On July 5, 1976, PMM presented its final report, concluding that, as of June 6, 1974, the book value or cost of Texaco Ecuador and Gulf Ecuador's producing assets, less depreciation and amortization, and the book value or cost of their materials and supplies inventory was in the total amount of approximately $182,000,000.

The Central Bank of Ecuador paid Texaco Ecuador and Gulf Ecuador 25 percent of this amount, or $45,033,671, as follows:

| Date | Payment to Texaco Ecuador | Payment to Gulf Ecuador |
| --- | --- | --- |
| July 1974 | $12,500,000 | $12,500,000 |
| October 1974 | 5,000,000 | 5,000,000 |
| January 1975 | 2,500,000 | 2,500,000 |
| June 1975 | 1,411,397 | 1,411,397 |
| January 1978 | 1,002,399 | — |
| April 1979 | — | 1,208,478 |

The total paid to Texaco Ecuador and Gulf Ecuador did not include any interest, despite the fact that payments were made over a period of almost five years.

None of the assets, materials and supplies had been paid for by Phoenix or Norsul and no part of the payments received

27. Arauz D–76–77.

28. Arauz D–263–65.

29. T–1566–67.

30. DTX–201. On May 22, 1975, Resolution 12560 established the conditions for the audit. Despite the provision in the June 14, 1974 Acta that the Government would pay for 25 percent of the unrecovered investment in the pipeline, Resolution 12560 provided that CEPE would not acquire an interest in the pipeline and pipeline assets were to be excluded from the audit.

by defendants for CEPE's participation was passed on to Phoenix or Norsul.

Three days before the June 6, 1974, acquisition by CEPE of its 25 percent share, Resolution 11927 was issued to clarify the basis for the calculation of the two percent payments to Phoenix and Norsul, and consequently of the 86 percent tax. The Resolution added an additional requirement: that henceforth one half of the 14 percent payments be retained for investment in Ecuador. Because the CEPE participation was imminent, Resolution 11927 also dealt with the impact on the two percent payments of CEPE's obtaining a 25 percent interest in the Texaco-Gulf consortium. Article 6 of Resolution 11927 provided that, as of the date of CEPE's participation, "there shall be excluded, in order to carry out the assessment of the 2% the percentage of CEPE in the net production...." It was upon this language that the Court in *Phoenix II* based its decision that defendants did not breach the 1965 Contract when they stopped making two percent payments on the value of CEPE's share.[31]

Texaco Ecuador and Gulf Ecuador reduced the two percent payments to Phoenix and Norsul by the 25 percent of CEPE's participation as of June 6, 1974.

Resolution 11927 was challenged by Texaco Ecuador and as a result was affirmed by a Ministerial Sentencia (Judgment), issued on October 2, 1974. The Sentencia further provided in Clause 3 that the exclusion of CEPE's participation from the calculation of the two percent payment would be "valid for any increase which may be obtained in this respect." Neither Phoenix nor Norsul made any appeal to the Government of Ecuador in regard to the provisions of Resolution 11927 and the Sentencia or to the reduction of the two percent payments.

Other aspects of defendants' relationship with the Government of Ecuador became increasingly troublesome during 1974, 1975 and 1976. One problem was overretainage of incautation deposits. The oil companies were required to deposit with the Central Bank all proceeds of their export sales of crude oil, or an amount equal to its tax reference value, whichever was greater. From these deposits, the Government would deduct the taxes and royalties due it and return the rest to the companies. The Central Bank failed to calculate correctly the amounts due to the Government and retained amounts which belonged to the oil companies. By 1976, the Government had overretained $22,000,000 of the monies due to defendants.

Internal consumption crude also was a problem. The oil companies were required to pay a royalty to the Government on internal consumption crude, based on the tax reference price. By October 1974, the royalty which defendants had to pay on each barrel was $2.22. However, the Government had unilaterally set the price it would pay for the purchase of each barrel of internal consumption crude at $1.48. Consequently, the companies actually lost money on each barrel of internal consumption crude that was sold. In addition, some of this crude was being delivered to national refineries and then exported by the Government for profit.

31. That Phoenix and Norsul were also of the opinion that Resolution 11927 terminated the two percent payments on CEPE's share can be seen from the April 15, 1975, letter of the Ecuadorian lawyer for Norsul (and Phoenix), Andres F. Cordova, to the then-Minister of Natural Resources, Admiral Salazar. This letter was not listed as an exhibit in the Pretrial Order. However, plaintiff moved its admission at trial as PTX 281. The translation of the letter into English is poor. The basic purposes of the letter were two: first, to request the release of a part of the seven percent of the two percent payments, which Resolution 11927 required Norsul and Phoenix to invest in Ecuador, in order that it could be used for preliminary stud-

ies and office expenses; and second, to persuade the Minister not to hold Norsul and Phoenix responsible for the outstanding debts of Minas. The letter also mentioned in passing that Resolution 11927 required that, in computing the two percent payments, the value of the CEPE participation first be subtracted. Dr. Cordova noted that this was a serious legal error, which injured Norsul's interests. The letter went on to state that, although Norsul considered this to be neither legal nor just, it had preferred not to raise this issue with the Government.

Dr. Cordova did succeed in his efforts to release investment funds and to free Norsul and Phoenix from responsibility for Minas's debts.

Between October 1974 and October 1975 the Ecuadorian income tax rate rose from 45 percent to 71.5 percent. The Government royalty on oil had also risen from six percent in 1969 to 16 percent. In November 1975, it was again increased, up to 17 percent.

The Government began restricting the amount of oil which the oil companies could produce. Then in April 1975, the Government decreed that CEPE's 25 percent participation would be based not on actual production but on a "presumed" production figure. The presumed production of 210,-000 barrels a day was not only greater than actual production, it was greater than the maximum volume which the Government permitted Texaco Ecuador and Gulf Ecuador to produce. Defendants were not in any way compensated for this maneuver which was in effect an increase in the percentage of CEPE's participation.

Moreover, CEPE was habitually late in meeting its 25 percent share of operating expenses and its payments for internal consumption crude.

In December 1975, the Government unilaterally set a presumptive production cost which was used to calculate Texaco Ecuador and Gulf Ecuador's income taxes. Actual costs were, in fact, higher than the "presumptive costs."

CEPE also began lifting crude oil which was not part of its 25 percent share, without compensating Texaco Ecuador and Gulf Ecuador for taking part of their share. The Government then demanded that the companies deliver an additional two million barrels to CEPE, without compensation, which it claimed was due to CEPE under "presumed" production figures.

Defendants had attempted without success to discuss their problems with the Rodriguez Lara government and with the military junta which replaced it in January 1976. Under the military junta, Col. Rene Vargas Pazzos, General Manager of CEPE, was appointed Minister of Natural Resources and Energy. Texaco Ecuador and Gulf Ecuador regarded Minister Vargas as an ideologue with nationalist, anti-capitalist, and anti-oil company views.

From the outset, Minister Vargas declared to Gulf Ecuador that it had no right to question the actions of the Government. Vargas and his deputy, Carlos Jaramillo, threatened Gulf Ecuador with nationalization of its interests. Terence O'Brien, who was President and General Manager of Gulf Ecuador, testified that the actions of the Government had brought about a de facto nationalization of Gulf Ecuador's rights without compensation. This continual erosion of Gulf Ecuador's position worsened in June 1976 with CEPE's lifting of crude which belonged to Texaco Ecuador and Gulf Ecuador. Both companies protested. Gulf Ecuador went farther and in July 1976, it filed suit in the U.S. District Court in California against Atlantic Richfield, claiming that Atlantic Richfield, the refiner which had purchased the oil in question, had wrongfully converted Gulf Ecuador's property. Because of this litigation CEPE was not paid for this shipment of oil by the broker who had arranged for its purchase by Atlantic Richfield. This situation further eroded Gulf Ecuador's relations with CEPE and the Ministry.

By mid-June 1976, Gulf Ecuador decided its only hope for relief was to place its incautation deposits in an interest bearing escrow account. Gulf Ecuador planned ultimately to turn these monies over to the Government when its problems were resolved. The amount of incautation deposits withheld was approximately equal to the overretainages of Gulf Ecuador's funds by the Government. In the event of the threatened nationalization, Gulf Ecuador felt that at least it would have saved the overretained taxes.

The reaction of the Minister, when he learned of the withheld incautation deposits, was to inform Gulf Ecuador that unless the withheld deposits were released by the end of August, Gulf Ecuador would be caduced.

Gulf Ecuador met with the military junta in mid-August to attempt to work out a compromise. The Junta added a new requirement, that Gulf Ecuador begin making incautation deposits not when it was paid for the crude, which was customary,

but at an earlier point, when the crude was loaded for export. Gulf Ecuador did begin to make immediate incautation deposits for its liftings of crude but it held on to the escrowed deposits.

Gulf Ecuador, facing caducity, decided to attempt to negotiate a withdrawal from Ecuador. On August 31, 1970, O'Brien delivered a letter to the Junta, requesting such negotiations. The next day, the Government delivered a formal notice that Gulf Ecuador would be caduced unless it deposited all funds owed within 30 days. Gulf Ecuador asked for help from the American Ambassador. With the intervention of the Ambassador, Gulf Ecuador obtained the agreement of the Government to reimburse it for the company's assets at net book value. An Inter-Institutional Commission was appointed to decide the terms on which Gulf Ecuador's interests would be terminated. At the third meeting of the Commission, Gulf Ecuador was informed that, whether or not an agreement had been reached, CEPE would begin lifting Gulf Ecuador's share of crude on January 1, 1977.

In the closing hours of 1976, the Government and Gulf Ecuador reached an agreement in principle by which CEPE acquired Gulf Ecuador's remaining 37.5 percent interest. The agreement provided for Gulf Ecuador to transfer its assets to the Government and for the Government to pay for these assets at net book value, or unrecovered actual cost. The Agreement described the subject of the sale and the price as follows:

2.1 By the present agreement Gulf [Ecuador] transfers in perpetuity in favor of CEPE the totality of its rights in the assets that correspond to it in the present CEPE/TEXACO/GULF consortium and those that correspond to it in the Trans-Ecuadorian Pipeline. Accordingly, as of December 1976, at 06:00 hours the contract for exploration and exploitation of hydrocarbons entered into on 6 August 1973, authorized by Decree No. 925 of 4 August 1973, is extin-

guished as to Gulf [Ecuador] by reason of transfer.

2.2 For the transfer established in the preceding paragraph of this clause the Government of Ecuador via CEPE, shall pay to Gulf [Ecuador] the percentage that corresponds to it in the amount of the investments not amortized made in the performance of the contract of 6 August 1973 and those preceding, in accordance with justifying documents for the investments and the respective physical inventory and, also the cost of equipment, materials and supplies in stock and in transit. . . .

2.3 To establish the values corresponding to the investments mentioned in the preceding number, the amounts for amortization and depreciation taken up to December 31, 1976 shall be deducted.

Clause 2.4 provided that an independent European auditing firm would be selected to establish the value of assets.

Gulf Ecuador insisted on a "quitclaim" as a term of the agreement. O'Brien testified that this was to make sure that Gulf Ecuador would not be required to face future claims that hadn't been addressed in the agreement. One such possibility was a demand, being talked about by leftist university students, that Gulf Ecuador pay for reservoir damage.[32] Clause 2.16 provided that "apart from the rights and obligations established in the present agreement, neither the Ecuadorian State nor CEPE owe anything to the Ecuadorian State or to CEPE."

The Government also then required a quitclaim, which appeared in Clause 2.13. According to Terence O'Brien, Clause 2.13 was supposed to protect the Government from contract payments which were owed by Gulf Ecuador but which had not yet been entered into Gulf Ecuador's books:

2.13 With respect to the obligations that Gulf [Ecuador] may have in favor of third parties and that do not appear in its accounting records, neither the Ecuadorian State nor CEPE assume any responsibility and must be taken care of by Gulf

32. T–1643.

[Ecuador].  Therefore, CEPE only assumes obligations in accordance with the present agreement.[33]

As of the end of 1976, with the execution of the agreement in principle, Gulf Ecuador terminated its interest in the Transfer Zone and stopped making payments to Norsul and Phoenix.  CEPE did not assume responsibility for any part of these payments.

A formal agreement between the Government and Gulf Ecuador was finalized on May 27, 1977 (the "1977 Transfer Agreement").  The 1977 Transfer Agreement tracked the language of the agreement in principle which we have quoted above.

The 1977 Transfer Agreement contained an additional Clause Fourth which included a passage from a letter written by Terence O'Brien to the Minister of Finance: "[W]e clarify that ... Gulf [Ecuador] shall not transfer to CEPE its liabilities, including its debts to third parties."  O'Brien testified that he wrote the letter at the urgent request of the Minister of Finance, that the Minister gave him no reason for the request and that he, O'Brien, was not referring in the letter to the two percent payments in any way.[34]

On September 14, 1978, the accounting firm of Deloitte, Haskins and Sells ("DHS") was selected to perform the audit to "determine the definitive value ... of the rights and shares of [Gulf Ecuador] in the assets of the Consortium CEPE–Texaco–Gulf and in the Pipeline."[35]

DHS issued its final report on April 17, 1979.  It concluded that the net book value or the unrecovered actual cost of Gulf Ecuador's remaining investment in producing assets and materials and supplies inventory in Ecuador, as of December 31, 1976, after deducting depreciation and amortization as of that date, was $74,792,625; that the cost of Gulf Ecuador's investment in the Pipe-line, after deducting depreciation and amortization, was $42,020,000; and that the Government of Ecuador still owed Gulf Ecuador the sum of $1,208,478 from the 1974 transfer to CEPE.

After DHS had concluded its audit, but before it issued its final report, the Ministry of Natural Resources sent to DHS "impugnations," questioning prior audit reports of Arthur Young & Company ("AY") and PMM.  One of the impugnations concerned the two percent payments by Gulf Ecuador on production from the Transfer Zone.  Since this item did not appear in the "State of Production Costs and Cost per Barrel Produced" of the AY final report, the Ministry believed it had been capitalized and included as investment.  DHS concluded from its review of the joint Texaco Ecuador/Gulf Ecuador books and the entries relating to the two percent payments in those books that these payments were not capitalized in any of the accounts included in net investment.  DHS determined that, because the two percent payments were not capitalized, they did not affect "net investment" upon which the price that CEPE paid was based.  The same challenge by the Ministry and resolution by DHS was made concerning the handling of the two percent payments in the PMM audit.

The Government of Ecuador made two payments to Gulf Ecuador of the balance owing for the acquisition of its interests, one payment on May 27, 1977, and the second on April 25, 1979.  Gulf Ecuador paid no part of these monies to Phoenix or Norsul.

On the basis of the facts found above, and with the benefit of our observations of the various witnesses and our conclusions as to their credibility, the Court finds further that the Government of Ecuador, in acquiring the interests of Gulf Ecuador and Texaco Ecuador in the Transfer Zone, did

---

**33.** Plaintiff argues that the two percent payments do not appear in Gulf Ecuador's books since Gulf Ecuador could not deduct these payments as production costs for Ecuadorian tax purposes and that, therefore, liability for these payments remained with Gulf Ecuador.  The fallacy of the argument that these payments did not appear in Gulf Ecuador's accounting books can be seen from the DHS audit, *e.g.*, Impugnation 11.18.

**34.** T–1648–49.

**35.** DTX 314B.

not pay any amount for production rights or lost future profits. In both the 1974 and the 1977 transfers, the Government intended only to pay Texaco Ecuador and Gulf Ecuador for the depreciated and amortized book value of their assets, plus the book value of their material and supplies inventory. It was contrary to the political philosophy of the Government of Ecuador in 1974 and in 1977 to pay for the oil reserves, which were the property of the State, the rights to exploit those reserves, or the future profits that might be earned from those reserves.

Furthermore, we find strong support for this conclusion in the fact that the price paid matched exactly the net book value of those assets acquired; that the acceleration of the acquisition of CEPE's 25 percent participation from 1977 to 1974 did not result in any payment to defendants for the loss of exploitation rights during those three years; and that defendants never received any compensation for the loss of profits and production rights from the Government of Ecuador in connection with other reductions in the size of the concession area or in the length of the exploitation period. We also note from the Impugnation to the DHS Audit that the hostility of the Ministry to the concept of paying for past two percent payments to Phoenix and Norsul, if those payments had been capitalized, reflects a similar hostility on the part of the Ministry to paying for future rights to such payments. In addition, there was never any study made by the parties, in connection with either the 1974 or the 1977 transfer, as to what was the value of petroleum reserves in the ground or of profits that might be earned from them. Finally, the Sentencia, affirming Resolution 11927, declared the intent of the Government that any future expansion of CEPE's interests be reflected by a corresponding reduction in the calculation base for the two percent payments.

### CONCLUSIONS OF LAW

#### I. UNJUST ENRICHMENT.

■ Because we have found as a matter of fact that Texaco Ecuador and Gulf Ecua-

dor were not compensated for production rights or loss of profits resulting from the conveyance to CEPE of their interests in the Transfer Zone, we find as a matter of law that plaintiff cannot succeed in its claim based on unjust enrichment under Ecuadorian law. Defendants were not enriched because the payments they received were compensation only for the net book value of their assets. The payments CEPE made to acquire its participation were not intended to and did not, in fact, compensate defendants for any future production rights or profits. Defendants were not enriched since they were compensated only for what CEPE obtained: their assets at net book value. Plaintiff suffered no loss because defendants did not receive or retain any benefit to which plaintiff was entitled. Failing to prove either of these two essential elements of an action *de in rem verso*, plaintiff cannot prevail in its claim for unjust enrichment.

We note moreover that, even if plaintiff had proved the elements of an action *de in rem verso*, still plaintiff has not proved damages. Plaintiff has acknowledged that part of the compensation received by Texaco Ecuador and Gulf Ecuador was for assets or investment in Ecuador. However, plaintiff never designated at trial what portion of the compensation received by defendants, according to plaintiff's theories, was for defendants' investments and what portion was for loss of profits or production rights. Without this allocation, plaintiff fails to meet its burden of proof. For this reason, even if plaintiff had demonstrated the right to recover for unjust enrichment, it could not prevail here because it has failed to prove damages.

#### II. BREACH OF CONTRACT CLAIM.

Turning to plaintiff's breach of contract claim, the surviving part of that claim is that defendants Texaco Ecuador and Gulf Ecuador incorrectly calculated the two percent payments for three quarterly periods beginning on October 1, 1973 and ending on June 2, 1974. Plaintiff contends that defendants improperly used the West Texas sour crude oil price instead of the higher

Ecuadorian government tax reference price to calculate the payments for the disputed quarters. Defendants, on the other hand, contend the payments were correctly calculated because the 1961 Concession Contract specifically provided for the use of the West Texas sour crude oil price.

### A. *Basis for Calculation of the Two Percent Payments.*

The 1961 Concession Contract between the Government of Ecuador and Minas incorporated Article 27 of the 1937 Hydrocarbons Law and established a formula for determining the price of oil for royalty payments to the government. Article 27 of the 1937 Hydrocarbons Law based the price of oil on the average price in the world market. Article 26 of the 1961 Concession Contract stated:

In accordance with letter A of Article 27 of the Petroleum Law, the parties agree that if the Government decides to collect in money, the royalty provided in clause 23rd of this contract, the value of the oil for this purpose, shall be periodically established by agreement between the Government and the concessionaire, thus: *the average value of the oil in the world market,* in the preceding quarter (this value represented by letter X), shall be determined applying the following formula: $X = A-B$.

A.—Letter A shall represent *the price posted or declared in an oil field of substantial production in the state of Texas ... for crude oil ...* plus the pipeline tariff established for the transportation of such crude oil from the producing field to the nearest export point.

B.—Letter B shall represent the cost of transportation of the crude oil from Guayaquil to the port of New York. (Emphasis added).

A part of the 1961 Concession grant to Minas was transferred to the defendants pursuant to the 1965 Contract. Clause 6 of the 1965 Contract requires that defendants pay to the transferor "an amount which represents the value ... of 2% of the net production" of all crude oil and natural gas produced in the Transfer Zone. Clause 6(b) states that the value of the crude oil:

[S]hall be understood as the value defined in each case for the purpose of calculating the payment of the royalties which cessionaires must make to the Government.

Clause 8 of the 1965 Contract further provides that it is the intention of the parties to calculate the two percent payments on the "same bases established for the respective payments to the Government according to the contract." The 1965 Contract defines such a reference to "the contract" as being to the 1961 Concession Contract.

Thus, the 1965 Contract made it clear that the two percent payments were to be calculated in the same manner as royalty payments to the Government would be computed under the 1961 Contract. The 1937 Law, which controlled these payments to the Government under the 1961 contract, specified that the price of oil would be based on the market price. The language of the 1937 Hydrocarbons Law together with the statement in the 1961 Contract that the desired price will be "the average value of the oil in the world market," gave an indication that the parties to the 1961 Contract intended to use the West Texas sour crude oil price only as a marker to arrive at the actual market price.[36]

In 1971 a new Hydrocarbons Law was enacted to replace the 1937 law. Article 65 of the new law replaced the government royalty valuation provisions of Article 27 of the 1937 law. Article 65 provided that:

Royalties in cash, income tax, Government's participation and generally any assessments depending on the sale price of hydrocarbons in the foreign market, *shall be regulated by the reference prices of petroleum.* (Emphasis added).

Article 65 also stated that, although these reference prices might be discussed with the producers, the price would be unilaterally set by the government.

No oil was produced in the Transfer Zone until 1972. Therefore, the 1937 method of

---

**36.** The West Texas price was reflective of world

market price at the time of the 1961 Contract.

valuation was never applied to set Government royalty payments on petroleum produced there; nor were the two percent payments ever calculated prior to the enactment of the 1971 Law.

Defendants contend that the effects of the 1971 Law so frustrated the purpose of the 1965 Contract that the defendants were not obligated to make the two percent payments based on the new tax reference price. They urge that a tax reference price, unilaterally established by the Government of Ecuador, cannot be used to replace the former bilaterally set royalty price, based on the West Texas sour crude marker.

When the new tax reference price went into effect, defendants decided that a new agreement was necessary. Norsul and Phoenix reluctantly agreed to enter into an Interim Agreement which established a new price valuation method. This agreement specifically provided that the parties were not waiving any rights under the 1965 Contract. The Interim Agreement covered the period from the commencement of production in the Transfer Zone in 1972 until March 31, 1973. Defendants made payments to Phoenix and Norsul in accordance with this agreement, not only through the first quarter of 1973 when, by its own terms, the agreement was terminated, but for the second and third quarters of 1973 as well. The Interim Agreement was voluntarily followed until war in the Middle East broke out in October 1973 and world oil prices and the Ecuadorian reference price skyrocketed. At the same time, the U.S. government imposed federal price controls on the West Texas sour crude oil, creating a drastic difference in price between the West Texas and world market prices.

This turn of events naturally made the West Texas price much more desirable as a marker to defendants than the tax reference price set by the government. Defendants subsequently paid Phoenix its portion of the two percent for the last quarter of 1973 and the first two quarters of 1974 calculated on the basis of the West Texas price.

It is not surprising that defendants began searching for an alternative when the price of oil and their obligations for the government royalty, and consequently to Phoenix and Norsul, climbed so radically in such a short period of time. However, this does not permit defendants to disregard the language of the 1965 Contract and the effects on it of the 1971 Law. The 1965 Contract adopts the Government royalty, as determined under the 1961 Contract. Once the 1971 Law was promulgated, calculation of government royalties under the 1961 Concession Contract was based no longer on Article 26 of the 1961 Contract, but on Article 65 of the 1971 Law. Defendants, pursuant to the 1965 Contract, paid their government royalty on oil, produced in the Transfer Zone, on the basis of the 1971 Law. It only follows that the two percent payments, based on the two percent of the royalty paid to the Government, should in the same way be computed on the basis of the royalty actually paid, not the royalty as it would have been calculated under an enactment which was no longer in effect. For this reason, the Court now concludes that it is the official government tax reference price, and not the West Texas sour crude or any other privately negotiated price, which should be used by Texaco Ecuador and Gulf Ecuador under the 1965 Contract, to calculate the two percent payments for the disputed quarters.

Defendants argue, however, that the propriety of their use of the West Texas price is confirmed by Resolution 11927, which was drawn up to settle the disagreements over the assessment of the two percent payments. Resolution 11927 provided that the tax reference price was to be used to calculate the two percent payments from June 3, 1974, and that the 86 percent tax on the payments would be recalculated retroactively, using the 1971 Law tax reference price. The relevant provisions of the resolution stated:

Art. 10—The Central Bank of Ecuador, with the participation of the representatives of the General Hydrocarbons Office and the National Development Bank will proceed to audit the assessments of the

payment of the two percent made *prior* to issuing the present Regulation and *shall carry out reassessments corresponding to the 86 percent* of the National Development Bank.

Art. 11—Provisions of the present Regulation, *insofar as they refer to the 14%* of the successors in rights of the grantees, shall be applied *from the present date* without prejudice to publication in the Official Registry. (Emphasis added).

This language indicates that Resolution 11927 did not address the issue of the 14 percent payments made prior to June 3, 1974, the date the resolution was issued. Minister Jarrin testified in his deposition that the fundamental purpose of the resolution was to ensure that the Development Bank was paid the correct amount of taxes on the two percent. The Development Bank needed a "clear basis" to establish the payment of the 86 percent tax. However, the private dispute over the computation of the 14 percent did not concern the Minister prior to the promulgation of 11927. Prospective calculation of the 14 percent was, on the other hand, of interest to the Government because 11927 created an obligation on the part of Norsul and Phoenix to invest one-half of their 14 percent in national development programs in Ecuador.[37] Dr. Luis Arauz, Minister Jarrin's legal adviser, also testified at his deposition that the Government was not interested in how payment had been agreed to between private parties:

> [T]his was a private contract and we could not interfere …
>
> This was something that had already been consummated, it was paid, and how much was paid, and how it was paid, I think we, as the Government, we would not have interfered in these very strictly private matters.[38]

Since Resolution 11927 did not effect the rights of the parties regarding the after tax 14 percent of the two percent until June 3, 1974, the payments for the previous quarters are controlled strictly by the contractual relationship between the parties.

This contract incorporated the price of West Texas sour crude as an example, not as a requirement. As we point out above, the language of the 1965 Contract requires the two percent payment to be calculated on the basis of the royalty paid to the Government, which, after the enactment of the 1971 Law, was the tax reference price.

Moreover, the fact that the Government of Ecuador refused to recompute the 14 percent for the periods prior to June 3, 1974, does not mean it adopted defendants' method of computation. It is more reasonable to conclude that this hands off attitude merely reflects the reluctance of the Government to get involved in that portion of the dispute in which it had no direct interest.

B. *Volume and Exchange Deductions.*

Plaintiff's contention that Texaco Ecuador and Gulf Ecuador have applied certain deductions to the volume base of the two percent payments which were not permitted by the 1965 Contract also has merit. Defendants deducted a 10 percent increase in the government royalty and a two percent currency exchange charge from the amount paid to plaintiff for the three disputed quarters.

The 10 percent volume reduction was imposed by defendants in order to offset the increase in government royalty from six percent at the time of the 1965 Contract to 16 percent in late 1973. This reduction was not authorized anywhere in the 1965 Contract, but defendants claim it is justified by "force majeure". "Force majeure" is defined in the Civil Code of Ecuador as an "act of God, the unforeseen which is not possible to avoid, such as a shipwreck, an earthquake, an imprisonment by enemies, acts of authority carried out by a public functionary, etc." Code Civil art. 30 (Ec.). The burden of proving an act of God is on the party who alleges it. Code Civil art. 1590 (Ec.).

■ The defendants have not met this burden as there has been very little if any

---

**37.** Jarrin D–92–94.

**38.** Arauz D–182–183.

showing that the 6 percent to 16 percent increase was unforeseen or impossible to avoid. It is true that there is ample evidence in the record of the drastic effect that the changing political climate had on the oil industry in Ecuador. However, there was no evidence that this specific 10 percent increase over a seven year period should not have been anticipated. An increase from the six percent specified in the 1961 Concession Contract could not have been completely unexpected in 1965 when other countries in the world where Texaco and Gulf were operating had higher royalties. Moreover, it was certainly possible to avoid the consequences of such an increase by providing for it in the contract.

Texaco Ecuador and Gulf Ecuador claim the same "force majeure" defense with regard to the two percent currency exchange charge. Defendants have again failed to meet their burden of proof as the possibility of a currency exchange charge can hardly be considered unforeseeable in this type of transaction.

### C. *Contract Damages.*

We have found that defendants Texaco Ecuador and Gulf Ecuador have breached their contract with plaintiff by incorrectly calculating the two percent payments for the three disputed quarters. The parties have stipulated that the amounts paid to plaintiff for those three quarters are as follows:

| | |
|---|---|
| 4th Quarter 1973 | $ 45,962 |
| 1st Quarter 1974 | $ 49,157 |
| 2nd Quarter 1974 | $109,047 |
| TOTAL | $204,166 |

The parties have also stipulated that, if the 14 percent payments were based on the tax reference price and the additional 10 percent and two percent deductions were not taken out, the plaintiff would be entitled to contract damages in the amount of $365,479. We find that plaintiff is entitled to recover this amount.

■ Finally, plaintiff for the first time in its post-trial briefing asserts a claim for consequential damages, including attorneys' fees, based on alleged bad faith by defendants' in their breaching of the 1965 Contract. This claim was not included in the Pre-Trial Order and we will not permit it to be raised now in this untimely manner.

### III. PREJUDGMENT INTEREST.

Phoenix contends it is entitled to prejudgment interest for the breach of contract claims from the date this action was commenced on November 26, 1976. A letter opinion by plaintiff's Ecuadorian law expert, Dr. René Bustamante, serves as the basis for Phoenix's assertions that Ecuadorian law entitles them to prejudgment interest. No other evidence of Ecuadorian law was offered by Phoenix, but the text of Monetary Board Regulation 755 and several sections of the Civil Code submitted by defendant help to clarify some of the statements made in Dr. Bustamante's letter.[39] Defendants also submitted the affidavit of their Ecuadorian expert, Dr. Miguel Andrade Varea, to counter the assertions of Dr. Bustamante.

■ The initial question of whether prejudgment interest is appropriate for defendant's breach of contract claim does not appear to be in dispute. Defendant's main contention, through its briefing and the Andrade affidavit, is that prejudgment interest is not permitted for the claim of unjust enrichment because the amount of the claim is not fixed until a judgment has been rendered by the court. Dr. Bustamante's letter does not address this issue of whether a definite or sum certain is required with respect to either the breach of contract or the unjust enrichment claims. However, defendant's expert does not contend that the amount due under the breach of contract claims are too uncertain under Ecuadorian law to be subject to prejudgment interest. Dr. Andrade simply concludes that "[p]rejudgment interest in Ecuador is unavailable on the plaintiff's claim for unjust enrichment." Therefore, this Court can only conclude that, to the extent certainty in the amount due is re-

---

39. These submissions by the defendant included: Articles 7 and 1611 of the Civil Code of Ecuador, Monetary Board Resolution 755, and Articles 25 and 28 of the Tax Code of Ecuador.

quired under Ecuadorian law, that requirement has been satisfied with respect to plaintiff's breach of contract claim, and prejudgment interest is applicable.

Having determined that defendants are liable for prejudgment interest, we must decide at what date the interest begins to accrue and what rate of interest to apply. The dispute over the date at which interest begins to accrue centers on whether the date of filing the complaint or the date of service of the complaint is controlling. The complaint was filed on November 26, 1976 and served on Gulf Ecuador on December 1, 1976 and on Texaco Ecuador on December 3, 1976.[40]

Defendant's expert, Dr. Andrade, states in his affidavit that if prejudgment interest were to be assessed it would begin to accrue only from the dates the complaint was served on the defendants. Andrade does not refer specifically to the basis for his conclusion. However, it is consistent with the principle that prejudgment interest cannot attach until the debtor is made aware of a definite sum which is due. Plaintiff disputes Dr. Andrade's conclusion but offers no support for its position. Dr. Bustamante's letter does not make any reference at all to a date when prejudgment interest should accrue, nor does he refer to whether the claim must be certain before prejudgment interest can attach. Since there is no evidence in the record to oppose defendant's position, we find that prejudgment interest shall accrue from the date of service.

The parties have not contractually stipulated to any particular rate of interest or formula to compute the interest. Where the rate has not been stipulated by the parties, both experts agree that the legal rate of interest applies. The legal rate of interest in effect in Ecuador at the time the complaint was filed and served was eight

percent per annum. Monetary Board Resolution 755, January 16, 1975. Defendants contend that this eight percent interest rate should be applied from the date of accrual to the present. Plaintiff, on the other hand, argues that the legal rate of interest increased five different times since Regulation 755 went into effect in 1975, and that the rate of prejudgment interest should increase as well during those periods. The last change went into effect on December 20, 1984 and increased the legal interest rate to 23 percent.[41] Therefore, the difference in rates asserted by plaintiff and defendant is dramatic.

Dr. Bustamante's letter consists of a somewhat detailed analysis of the rates of interest in the Ecuadorian legal system. Dr. Andrade simply makes a conclusory statement that the rate of interest is to be calculated at a rate of 8 percent from the time the complaint was served. However, Dr. Andrade cites and includes as exhibits to his affidavit Article 7 of the Civil Code and a judicial opinion of the Supreme Court of Justice of Ecuador. *Segoria v. Acosta,* Judgment No. 341, Third Chamber, November 11, 1977. Article 7 of the Civil Code establishes the general principle that a new law shall prevail over a previous law where provisions in the two laws conflict. This provision obviously favors plaintiff's position that the rate of interest should increase with the legal rate.

In the *Segoria* case, a legal rate of 6 percent, the rate in effect at the time the complaint in *Segoria* was served, was applied for the entire period even though Resolution 755 changed the rate to 8 percent two years before the decision was rendered by the Court. The Court based its decision upon language in Article 8 of Regulation 755 which states that the provisions of the "Regulation shall apply only to

**40.** Although the length of time between the dates is not great, the controlling date must be determined in order to properly measure the amount of prejudgment interest due.

**41.** Increases in the legal interest rate in Ecuador as set forth by Dr. Bustamante in his letter opinion of June 11, 1985, were as follows:

1975 Regulation 755, January 25, 1975, 8%
1982 Regulation 1170, Janurary 11, 1982, 15%
1983 Regulation 061, March 19, 1983, 16%
1983 Regulation 125, October 27, 1983, 19%
1984 Regulation 175, June 26, 1984, 21%
1984 Regulation 214, December 20, 1984, 23%

Plaintiff has represented to the Court that no changes in the interest rate have been made since December 20, 1984.

the acts and contracts entered into from and including the date it is published in the *Registro Oficial.*" *Segoria* at 11; Regulation 755, Article 8. However, there are two problems with this analysis which cast doubt on defendants' position. First, judicial decisions are not binding precedent in a civil law jurisdiction such as Ecuador. *Phoenix III* at 10 n. 11 [Available on WESTLAW, DCT database]. Second, the language of Regulation 755, which is quoted above and cited in *Segoria,* is immediately followed by language which states, "[t]herefore, the types of interest rates *stipulated* in the acts and contracts entered into prior to that date ... shall continue in effect until the expiration date agreed upon in the respective acts or contracts." Regulation 755 (emphasis added). This language indicates that the new interest rate will not apply to any existing contracts which had already stipulated the interest rate. However, in situations where no interest rate has been agreed upon by the parties, the current legal rate of interest should be held to apply.

For this reason, we find that the rate of prejudgment interest shall begin at 8 percent per annum and increase in accordance with increases in the Ecuadorian legal rate of interest.

## IV. LIABILITY OF PARENT CORPORATION.

Phoenix asks the Court to find liability not only on the part of the subsidiaries, Texaco Ecuador and Gulf Ecuador, but on the part of the parent corporations, Texaco and Gulf. Since we have ruled that the subsidiaries did breach the 1965 Contract in their calculation of the two percent payments for the disputed quarters, we must now examine this claim against the parent corporations. Plaintiff advances the theory that liability rests with the parents be-

cause the subsidiaries were acting purely as agents of the parent corporations in all matters relevant to this cause of action.

Both parties agree that Delaware law should apply to this question.[42] There are essentially two general theories of liability under which a parent corporation may be held responsible for the obligations of its subsidiaries. Some courts, using the phrases "pierce the corporate veil", "alter ego" or "instrumentality", have imposed liability on the parent corporation only when there is a showing of fraud or inequity. *See Sears Roebuck and Co. v. Jardel Co.,* 421 F.2d 1048, 1053 (3rd Cir.1970); *Pauley Petroleum Inc. v. Continental Oil Co.,* 239 A.2d 629, 634 (Del.1968); *Skouras v. Admiralty Enterprises, Inc.,* 386 A.2d 674, 681 (Del.Ch.1978). Other courts have based liability of the parent on the principles of agency, without reference to fraud or inequity. See *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.,* 456 F.Supp. 831, 839–840 (D.Del.1978).

Phoenix bases its claim of parent liability on the agency theory only. Under the agency theory, the issue of liability rests on the amount of control the parent corporation exercises over the actions of the subsidiary. The parent corporation will be held liable for the activities of the subsidiary only if the parent dominates those activities. *Id.* at 841. Factors to consider in determining whether "domination" exists include "stock ownership, officers and directors, financing, responsibility for day-to-day operations, arrangements for payment of salaries and expenses, and origin of subsidiary's business and assets." *Id.; Fish v. East,* 114 F.2d 177, 191 (10th Cir. 1940).

Both Gulf Ecuador and Texaco Ecuador were wholly owned subsidiaries of their parent corporations. This alone does

---

**42.** Judge Schwartz in *Phoenix II* has already held that Ecuadorian law should apply to the substantive issues in this case. However, Judge Schwartz did not address the issue of whether Gulf and Texaco may be held liable for the obligations of their subsidiaries. Because the subsidiaries here are Delaware corporations, and one of the parent corporations, Texaco, is a Delaware corporation, it is appropriate that Delaware law be applied in deciding this issue of parent corporation liability for the activities of its subsidiary. *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil,* 456 F.Supp. 831, 840 (D.Del. 1978).

not make a subsidiary the agent of its parent. *Scott-Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 314 (Del.Super. 1973). The boards of directors of Gulf Ecuador and Texaco Ecuador were separate from those of the parent corporations although there were officers and directors common to the boards of both parent and subsidiary. Again, this similarity by itself does not indicate an agency relationship. *Japan Petroleum*, 456 F.Supp. at 841. The parent corporations were also involved in the substantial financial decisions of the subsidiaries. According to Robert Shields [43], Texaco Ecuador needed the approval of Texaco to get money for very large investments and for the acquisition or sale of major assets.[44] Gulf Ecuador also sought approval from its parent on policy matters and major financial matters.[45]

On the other hand, each subsidiary kept books and records completely separate from the parent corporation; each maintained its own bank accounts and paid its own taxes. The subsidiaries, although Delaware corporations, had their principal places of business in Ecuador and were completely responsible for their day to day operations in that country. This included drilling oil wells, building the pipeline, and participation in the management of these projects. The 1973 Exploitation Contract, the June 14, 1974 Acta and the 1977 Transfer Agreement were all executed by Texaco Ecuador and Gulf Ecuador.

In a case decided in this Court, *Japan Petroleum*, 456 F.Supp. 831, a Nigerian corporation sued a Kentucky corporation and two of its wholly owned subsidiaries for breach of contract. The Court noted that no agency relationship existed between the subsidiary and parent in spite of substantial evidence of joint operations. The Court found that the parent was very active administratively and monetarily in getting the operations of the subsidiary started, most of the officers and directors

were the same, the parent provided consulting services to the subsidiary, all expenditures over $250,000 had to be approved by the parent, the parent paid the salaries of all non-Nigerian employees of the subsidiary, the parent guaranteed three major bank loans of the subsidiary and the annual report of the parent reported that the operations of the subsidiary were actually the operations of the parent. *Id.* at 842, 843.

In spite of all of these factors, the Court determined there was sufficient indicia of separate corporate ownership to keep the subsidiary from being considered the agent of the parent. For example, the subsidiary was an operating corporation with obligations and rights of its own in Nigeria, the Nigerian government exercised extensive control over the operations of the subsidiary, the subsidiary had its own bank accounts and a substantial book value, the bank loans had been repaid by the subsidiary, the subsidiary had its own offices in Nigeria, hired its own employees and debited its accounts for any salaries paid by the parent. In essence, "the overall picture ... is not one of complete domination or control." *Id.* at 844–845.

■ In light of the facts in *Japan Petroleum*, it can hardly be said that the facts presented to the court in this case show complete domination or control by Texaco and Gulf over their subsidiaries. Gulf Ecuador and Texaco Ecuador, not the parent corporations, were authorized to exploit the oil reserves in the Transfer Zone and carried out the day to day activities, required to accomplish this. The facts of this case seem to indicate even less control by the parent corporations than was exercised by the parent in the *Japan Petroleum* case. Therefore, we conclude that Texaco and Gulf shall not be held liable for the activities of their subsidiaries.

## CONCLUSION

For the reasons stated above, judgment is granted in favor of defendants on the

---

43. Robert Shields was Chairman of the Board and Chief Executive Officer of Texaco Ecuador and Vice President in charge of production in Latin America at Texaco, Inc.

44. T–1256.

45. T–1575.

claim of unjust enrichment. On the claim of breach of contract, based on the miscalculation of the two percent payments for the three quarters at issue, judgment is granted in favor of plaintiff against Gulf Ecuador and Texaco Ecuador but not against the parent corporations. Plaintiff shall submit an Order, awarding damages of $365,479 against Gulf Ecuador and Texaco Ecuador, with interest to be computed as set out above.