PHOENIX CANADA OIL COMPANY, LTD., Plaintiff,

v.

TEXACO INC. and Texaco Petroleum Co., Defendants.

No. 89 Civ. 7074(KC).

United States District Court, S.D. New York.

Oct. 23, 1990.

---

Victor Muskin, Munves, Tanenhaus & Storck, P.C., New York City, for plaintiff.

Milton Sherman, Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

CONBOY, District Judge:

Phoenix Canada Oil Company, Ltd. ("Phoenix"), a Canadian corporation, brings this diversity action for breach of contract

and fraud against Texaco Inc. and its subsidiary Texaco Petroleum Company (together, "Texaco"), both Delaware corporations. In essence, Phoenix alleges that Texaco owes Phoenix royalty payments dating back to 1976 for oil production from an Ecuadorian oil well. It seeks contract damages and a declaration that it is entitled to royalties for future production. Phoenix also alleges that Texaco fraudulently induced Phoenix to refrain from filing an action for breach of contract in the 1970's when Phoenix first became aware of the alleged breach. Now pending before the Court are Texaco's motion to dismiss the fraud claim, and cross-motions for partial summary adjudication of the contract and declaratory judgment claims.

## I. FACTUAL BACKGROUND

The following facts are not in dispute. In 1961 the Government of Ecuador granted to Minas y Petroleos del Ecuador, S.A. ("Minas") a concession to explore for and extract oil in a large area of eastern Ecuador (the "Pastaza" concession). In 1964, the Ecuadorian government granted a neighboring concession, the "Napo" concession, to a consortium made up of subsidiaries of Gulf Oil Corporation and Texaco Inc. ("Gulf/Texaco"). The Napo concession bordered the Pastaza concession on the north. In a contract dated July 16, 1965 (Cmpl't Ex. A), Minas transferred a northern portion of the Pastaza concession to Gulf/Texaco. This portion, the "Coca" concession, was intended to abut the Napo concession. In exchange for the transfer of oil rights, Gulf/Texaco paid Minas a lump sum and agreed to pay Minas, quarterly, upon commencement of commercial production, a sum equal to 2% of the value of the oil taken by Gulf/Texaco from the wells within the Coca concession. Eventually, Phoenix and Norsul Oil and Mining Company, Ltd. ("Norsul") each obtained a 50% interest in Minas' rights to the 2% payments (i.e., Phoenix became entitled to a 1% royalty on Gulf/Texaco's Coca concession production).[1]

Although the Coca concession was intended to abut the Napo concession, due to imprecise descriptions of the concession boundaries there was an apparent overlap of several hundred meters in the northern boundary of the Coca concession and the southern boundary of the Napo concession. In the late 1960's, Gulf/Texaco drilled an oil-producing well known as Shushufindi No. 1 (the "S-1" well) in or near the overlap area. Norsul announced, in early 1969, that the well was within the Coca concession, and that Norsul would therefore be entitled to royalty payments. Texaco/Gulf announced that the well was in the Napo concession and that no royalties would be paid to Norsul. Norsul then filed a federal securities action against Texaco Inc. and Gulf Oil Corporation in the Southern District of New York ("the New York action"). In June 1969 the Ecuadorian Government redefined the concession boundaries to eliminate the overlap. On May 5, 1970, Judge Pollack signed a stipulation dismissing the New York action. (Cmpl't Ex. B.) The stipulation provided:

> Defendants Texaco Inc. and Gulf Oil Corporation shall and hereby do acknowledge that the well known as Shushufindi No. 1 is presently located within the area which is commonly known as the "Coca Concession"; and that by reason of the above, Minas y Petroleos del Ecuador, S.A., its successors and assigns, are entitled to two percent of the net production of said well as defined in their private contract dated July 16, 1965 with Compania Texaco de Petroleos del Ecuador, C.A. and Gulf Ecuatoriana de Petroleo, S.A.

Commercial production of oil from the S-1 well began in May 1972. From then until January 1976 Gulf/Texaco made quarterly payments to Phoenix and Norsul. On March 26, 1976, Texaco Petroleum, on behalf of Gulf/Texaco, sent Norsul a survey "monograph" prepared by Ecuador's Military Institute of Geography (the "1976 sur-

---

1. Since the early 1960's Minas had in essence been jointly owned by Phoenix and Norsul. *Phoenix Canada Oil Company, Ltd. v. Texaco,* *Inc.,* 658 F.Supp. 1061, 1064–65 (D.Del.1987). Phoenix obtained its half interest in the royalty payments in August 1971. *Id.* at 1068.

vey") which set forth coordinates for the S–1 well. These coordinates located the S–1 well within the Napo concession, and not the Coca concession. (Cmpl't Ex. C.) Phoenix states that the 1976 survey was not sent to them at that time, and that they learned of it from Norsul (Moore affidavit of May 16, 1990, ¶ 14 at 6–7); no evidence has been introduced to dispute this statement. The royalty payments for the first quarter of 1976, due in April 1976, did not include payments for production from the S–1 well, and Texaco has not paid any royalties to Phoenix for S–1 production since that time.

In September, 1976, Norsul filed suit against Texaco and Gulf in the Southern District of Florida, *Norsul Oil & Mining Co., Ltd. v. Texaco, Inc., et al.*, 76–1629 (WMH) (the "Florida action"), for breach of contract, breach of fiduciary duty, and unjust enrichment. Norsul claimed that the royalty payments were deficient for a number of reasons, including that S–1 production had been improperly excluded. Twelve years later, the Florida action was tried, and in December 1988 the court issued a Memorandum Opinion (Cmpl't Ex. D.), which, *inter alia*, held that the 1976 survey did not negate Texaco's obligation under the 1970 stipulation to pay royalties on S–1 production.

Phoenix also commenced litigation in 1976. Its action, brought in Federal District Court in Delaware, *Phoenix Canada Oil Co., Ltd. v. Texaco, Inc.*, 76–421 (the "Delaware action"), was filed some two months after Norsul's and asserted claims similar to those asserted by Norsul in the Florida action. Phoenix's complaint did not expressly assert a claim for the withheld S–1 royalties. The Delaware action was dispatched within twelve years, following a bench trial and decision, 658 F.Supp. 1061 (D.Del.1987), and an affirmance by the Third Circuit, 842 F.2d 1466 (3d Cir.1988), *cert. denied*, 488 U.S. 908, 109 S.Ct. 259, 273, 102 L.Ed.2d 247 (1988). In the end, Phoenix prevailed on a portion of its breach of contract claim, but lost on the balance of that claim as well as on its claims for unjust enrichment and intentional infliction of economic injury. The Delaware court did not rule on the S–1 claim.

In this action, Phoenix's breach of contract and declaratory judgment claims are based on Texaco's obligation to pay Phoenix the 1% royalty on S–1 production, pursuant to the 1965 contract and the 1970 stipulation. Phoenix seeks to invoke offensive collateral estoppel and contends that the Florida court's holding that the 1970 stipulation continues in force is binding here. Texaco counters that Phoenix's claim accrued in 1976 and is therefore bared by the statute of limitations. Texaco also contends that Phoenix's S–1 claim could and should have been included in Phoenix's 1976 action and is therefore barred by res judicata. Texaco further counters that the Florida decision does not have any preclusive effect here.

Phoenix's fraud claim is based on certain omissions by Texaco early in the Delaware litigation. Phoenix alleges that after it learned that the S–1 payments were being withheld, and as it was considering whether to include a claim for those payments in its suit, Texaco dissuaded it from doing so. Texaco allegedly accomplished this by asserting that such a claim would fail in the face of a defense based on the Act of State doctrine, representing that the 1976 survey was an official governmental act. Texaco allegedly did not inform Phoenix, however, that Texaco itself had solicited the survey. Because of this omission, Phoenix claims, it did not include a claim for S–1 royalties in the Delaware action, and only became aware of the viability of such a claim in 1988, when the Florida court rendered its decision in the Norsul action. Texaco counters that its statements constituted merely a legal opinion offered by an opponent during litigation, and as such did not entitle Phoenix to rely on them.

## II. DISCUSSION

### A. *Motion to Dismiss the Fraud Claim* [2]

#### 1. The Allegations

The operative allegations of Phoenix's fraud claim are set forth in its complaint as follows:

53. Defendants' repeated representations that an official Ecuadorian government survey had definitively located the Shushufindi No. 1 well in the Napo concession were false and fraudulent.

54. Defendants' representations were intended to and did cause Plaintiff to believe that the survey in question was a binding sovereign act of the Ecuadorian government that was immune from review under the act of state doctrine, and to conceal the fact that the survey was nothing of the sort but had, upon information and belief, been unilaterally procured by and performed at the behest of the Defendants.

55. Plaintiff relied on Defendants' misrepresentations to its detriment by not interposing a Shushufindi claim in the 1976 Phoenix Action.

Cmpl't at 18–19.

Phoenix's complaint alleges four specific statements made by Texaco. Only one of these statements was made to Phoenix. The others were made to Norsul in the course of the Florida litigation.[3] The fraudulent statements specifically alleged are as follows:

(1) In a December 1976 memorandum of law in support of its motion to dismiss in the Florida action, Texaco stated

"On January 12, 1976 Texaco Petroleum received from the Ecuadorian Institute of Military Geography its conclusive determination that the well does not lie within the Coca concession. Accordingly, Plaintiff's present factual assertion that Shushufindi No. 1 is located within the Coca concession area has been fore-

closed by the contrary Ecuadorian determination."

Cmpl't ¶ 42(a) at 14.

(2) In that same memorandum, in arguing for dismissal under the Act of State doctrine, Texaco stated, " 'inquiry into ... the determination of the Institute of Military Geography that Shushufindi No. 1 is not located with the Coca Concession' would involve improper judicial inquiries into the motivations behind Ecuador's governmental acts." Cmpl't ¶ 42(b) at 14.

(3) In a proposed pre-trial stipulation filed in 1981, Texaco stated:

"[O]n January 12, 1976, the Instituto Geographico Militar ('IGM'), an agency or instrumentality of the Government of Ecuador, informed Texaco Petroleum Company that Shushufindi No. 1 was located at 0° 10' 12.6185″ South latitude. This definitively establishes the well's location outside the Coca concession.... The I.G.M.'s location of Shushufindi No. 1 has been accepted by the Government of Ecuador and its agencies."

Cmpl't ¶ 42(c) at 15.

(4) In 1980 in response to Phoenix's request for admissions in the Delaware action, Texaco stated: " 'Subsequently, in January 1976, a survey by Ecuador's Instituto Geographico Militar showed the Shushufindi No. 1 well to be in the Napo concession.' " Cmpl't ¶ 44 at 15. This is the only statement specifically alleged to have been made to Phoenix.

In their opposition brief here, plaintiff has characterized its claim as follows:

The claimed fraud is ... that Defendants, although repeating again and again that the 1976 survey was the definitive sovereign act of the Ecuadorian government, ... concealed the suspicious circumstances concerning their involvement in obtaining it.... Defendants had exclusive knowledge of these facts,

---

2. In resolving the motion to dismiss, the Court has not relied upon any materials outside the complaint and the parties' briefs on the motion to dismiss.

3. Phoenix alleges that "[i]n reliance upon Defendants' contentions in *both the 1976 Norsul Action and* the 1976 Phoenix Action concerning

the 1976 survey and the act of state doctrine, Plaintiff determined not to seek amendment of its complaint to interpose a Shushufindi claim in the 1976 Phoenix action and did not do so." Cmpl't ¶ 45 at 15–16 (emphasis added). We do not address whether Phoenix may base a fraud claim on statements made to a third party.

knowledge not available to Plaintiff.... These intentionally misleading nondisclosures lent credibility that would have otherwise been lacking to Defendants' counsel's legal "opinion".... It was the concealment of these material facts, not the opinion of counsel, that misled Plaintiff to its detriment. That is the fraud.

(Phoenix's Mem. in Opp. to Motion to Dismiss at 11–13.) For purposes of this motion, we will accept plaintiff's own characterization of its claim where helpful to plaintiff.

### 2. Justifiable Reliance

In order to state a claim for fraud, a plaintiff must be able to demonstrate that its reliance on the allegedly fraudulent statements or omissions was reasonable and justifiable. *E.g., Lanzi v. Brooks,* 54 A.D.2d 1057, 388 N.Y.S.2d 946 (3d Dep't 1976), *aff'd,* 43 N.Y.2d 778, 402 N.Y.S.2d 384, 373 N.E.2d 278 (1977); *Harris v. Camilleri,* 77 A.D.2d 861, 431 N.Y. S.2d 65 (2d Dep't 1980).[4] Phoenix cannot do so here, and its fraud claim must be dismissed.

The most salient feature of plaintiff's claim is that plaintiff—a corporation represented by counsel and involved in substantial litigation with defendant—allegedly relied upon an omission of fact contained in voluntary statements made to plaintiff (or Norsul) by its litigation opponent that were obviously intended to induce plaintiff to drop a claim. Phoenix does not allege that the allegedly fraudulent statements were false responses to directed inquiries, but merely that Texaco neglected to inform Phoenix of a fact which may or may not have been useful to Phoenix in fashioning a response to an Act of State defense. Plaintiff does not allege that it made any sort of further investigation—neither an informal pre-filing inquiry nor a formal discovery request—the usual and expected first step

in evaluating the strength of a potential claim and a potential defense to it; Phoenix chose instead to rely at face value on its opponent's characterization of the law and the facts. Phoenix was certainly free to make that choice, for reasons of litigation or business strategy, financial restraints,[5] or other reasons, but its election to forgo its S–1 claim can not be justified by blind reliance on Texaco's statements. *See Most v. Monti,* 91 A.D.2d 606, 456 N.Y.S.2d 427 (2d Dep't 1982) (no recovery for fraud where plaintiff did not conduct reasonable investigation). The law does not condone misleading or fraudulent statements, even those made in the context of adversarial struggle, but each side in a litigation does bear the responsibility for developing and presenting the facts and law most favorable to its position. Phoenix's utter failure to do so here can not be justified by any of the alleged statements of Texaco.

That Phoenix's alleged reliance on Texaco's omissions was unreasonable is highlighted by the behavior of Norsul—and of Phoenix itself—in the Florida and Delaware actions. Despite the fact that Texaco actually asserted and litigated (not merely threatened to, as Phoenix claims was done regarding its S–1 claim) the Act of State defense in the Florida action, Norsul pressed its S–1 claim and indeed eventually prevailed on it. And Phoenix itself actively litigated the Act of State defense at least twice in the Delaware action with respect to its other claims. *See Phoenix Canada Oil Co., Ltd. v. Texaco Inc.,* 78 F.R.D. 445, 458–59 (D.Del.1978); 560 F.Supp. 1372, 1381 (D.Del.1983).

Further, from the face of the complaint and the attached exhibits, it is evident that Phoenix's reliance on the alleged omissions could not have been justified or reasonable because the I.G.M. letter to Texaco accompanying the survey states on its face: *"By means of a contract* signed April 1, 1975,

---

**4.** Texaco contends that New York law applies to the fraud claim. *See* Memo in Support of Motion to Dismiss at 17 n. 3. As Phoenix does not suggest that any other law should apply, and application of New York law appears appropriate, we shall apply New York law.

**5.** *See* Plaintiff's "Combined Reply and Answering Brief on Cross–Motions for Partial Summary Judgment" at 22. "Plaintiff was faced with the choice of pursuing what then appeared to be a doubtful claim or concentrating its limited resources on other claims which it then believed to be more promising."

the Institute for Military Geography *became obligated to* carry out the establishment of boundaries and the surveying and monumenting of the CEPE–TEXACO–GULF concession area." (Cmpl't Ex. C. (emphasis added).)[6] The letter goes on to say, *"[a]s it is necessary to increase* both the amount of time and *the price* for the establishment of boundaries, surveying, monumenting and map-making, *I am sending you a draft of an extension of contracts* MC–E–394 and MC–E–395, so that you may make any revisions you wish before signing." *Id.* (emphasis added) This letter provided a clear indication that the survey had been solicited and paid for by Texaco; at a minimum, it put Phoenix on notice of that possibility. It was thus unreasonable, as a matter of law, for Phoenix, with this knowledge in its possession, to rely solely on Texaco's alleged omissions to draw the conclusion that the survey was not solicited or paid for by Texaco.[7]

Phoenix alleges that "[p]rior to the 1988 decision in the Florida ... Action, Plaintiff ... had no reason to know or suspect that the said survey ... had been unilaterally obtained or procured by and for Defendants." (Cmpl't ¶ 48 at 17.) That conclusory allegation cannot stand in the face of the contents of the transmittal letter. A fair reading of the complaint demonstrates that Phoenix had knowledge of the existence of the letter.[8] Even if Phoenix did not

examine or know about the letter, however, we conclude that, in the circumstances alleged here, it was unreasonable as a matter of law for Phoenix to rely on Texaco's statement concerning the 1976 survey without examining or attempting to examine a copy of the document itself. Thus, either Phoenix had knowledge of the contents of the transmittal letter, in which case it was not justified in believing that Texaco did not have a role in obtaining the survey, or Phoenix did not see or attempt to obtain the transmittal letter,[9] which in itself would undermine the element of reasonable reliance.

### 3. Materiality

■ Apart from the issue of justifiable reliance, Phoenix's claim must fail because Phoenix can not show that the alleged omissions were material. *E.g., Jonari Management Corp. v. St. Paul Fire & Marine Ins. Co.,* 87 A.D.2d 540, 447 N.Y. S.2d 958 (1st Dep't 1982), *modified,* 58 N.Y.2d 408, 461 N.Y.S.2d 760, 448 N.E.2d 427 (1983) (no recovery for fraud unless misrepresentation is material). Under the act of state doctrine, as interpreted by the courts during the time period relevant here, it was immaterial how the official decree of a foreign government originated, or that such a decree was obtained at the request of a private party. "[I]nquiries by [a] court into the authenticity and motivation of the acts of foreign sovereigns" are pre-

---

**6.** The survey and the transmittal letter were written in Spanish. We quote the English translation included as part of Exhibit C to the complaint.

**7.** Phoenix attempts to make much of the notation "17–XI–73" on the survey, contending that it is a date—November 17, 1973—which predates the contract mentioned in the letter. Phoenix also claims to see importance in the statement that the contract was to survey "the CEPE–TEXACO–GULF concession." (Moore Affid. of May 16, 1990, ¶¶ 9–11 at 3–5.) These points are completely irrelevant to the issue of whether Phoenix's blind reliance on Texaco's statements was justifiable in the face of the quoted language.

**8.** Phoenix alleges that it relied "upon Defendants' contentions in both the 1976 Norsul Action and the 1976 Phoenix action." (Cmpl't ¶ 45 at 15.) One of the contentions specified is Texaco's statement in its 1976 motion to dismiss in the Florida action that "[o]n January 12, 1976

Texaco Petroleum received from the Ecuadorian Institute of Military Geography its conclusive determination that the well does not lie within the Coca concession." (Cmpl't ¶ 42(a) at 14.) Plaintiff's complaint quotes more of this passage, but omits, without any indication of the omission, the next sentence: "[Norsul] received copies of these documents." (See Texaco's Reply Mem. at 4 n. 3 and Ex. A to the Reply Mem. at 22.) We take judicial notice of the full quotation, contained in an official court document cited by the Complaint, and conclude that fairly read, the Complaint alleges that Phoenix had knowledge of the existence of the transmittal letter.

**9.** There is no allegation that Phoenix could not have obtained the letter, or that it made such an attempt and was thwarted, or that it was supplied with the survey "Monograph" itself, but not the transmittal letter.

cluded by the act of state doctrine. *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F.Supp. 92, 109–110 (C.D.Cal. 1971), aff'd per curium adopting district court's opinion, 461 F.2d 1261 (9th Cir. 1972). *See also, O.N.E. Shipping v. Flota Mercante Grancolombiana*, 830 F.2d 449, 452–53 (2d Cir.1987); *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 407 (9th Cir.1983); *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 75–78 (2d Cir.1977). Thus, to the extent that Phoenix relied upon Texaco's assertion of the act of state defense in its decision not to press its S–1 claim, Phoenix would have had no basis to decide differently even if it knew that Texaco had solicited and paid for the 1976 survey. In other words, the state of the law during the relevant period [10] was such that the alleged omissions by Texaco were irrelevant to a determination of the validity of the act of state defense.

Further, by 1979 the Third Circuit (in which the Delaware action was pending) had indicated that it favored a less absolute interpretation of the act of state doctrine than found in *Hunt* and *Occidental Petroleum. See Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1293 (3d Cir. 1979) (act of state preclusion "is not lightly to be imposed and to determine whether [it] applies in a given factual context, the court must analyze the nature of the questioned conduct and the effect upon the parties in addition to appraising the sovereign's role."). *See also, Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1059–61 (3d Cir.1988), *aff'd*, —— U.S. ——, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990); *Williams v. Curtiss–Wright Corp.*, 694 F.2d 300, 302–03 (3d Cir.1982). While such a case-by-case approach might seem to make Texaco's alleged omissions more like-ly material, a close reading of *Mannington Mills* and its progeny reveal that, in the Third Circuit at least, Phoenix might have successfully opposed Texaco's invocation of act of state on other grounds entirely—without any reference to whether Texaco induced the survey.

For example, *Mannington Mills* and *Curtiss–Wright* "require that a defendant come forward with proof that adjudication of a plaintiff's claim poses a demonstrable, not a speculative, threat to the conduct of foreign relations by the political branches of the United States government," *Environmental Tectonics*, 847 F.2d at 1061, and *Mannington Mills* refused to apply the act of state doctrine to a case involving a foreign government's granting of a patent, an act which is "in substance ministerial activity, [and] not the kind of governmental action contemplated by the act of state doctrine...." *Mannington* 595 F.2d at 1294. *See also Timerberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 607–08 (9th Cir.1976) ("depth and nature of [foreign sovereign's] interest" relevant to application of act of state doctrine; sovereign's act must be intended to give effect to its "public interests," not merely to "adjudicat[e] disputes or claims that arise within its territory.") Here, Phoenix may well have been able to defeat the act of state defense on the basis of this element of the doctrine because the government act being invoked was quite plausibly a "ministerial" survey which primarily involved private interests. That there were other plausible legal theories, besides that Texaco induced the 1976 survey, which may have defeated the Act of State defense provides additional grounds to conclude that Texaco's alleged omissions were immaterial.[11]

**10.** The Supreme Court has recently held that the act of state doctrine does not bar inquiry into the motivations of a foreign sovereign in performing official acts, but merely requires U.S. courts to deem valid the acts of foreign sovereigns taken within their own jurisdictions. *W.S. Kirkpatrick v. Environmental Tectonics Corp.*, —— U.S. ——, 110 S.Ct. 701, 704–07, 107 L.Ed.2d 816 (1990). Apart from the fact that this decision was rendered several years too late to have any bearing on Phoenix's behavior, it does nothing to help Phoenix's position because

to the extent the 1976 survey has any bearing on Phoenix's S–1 claim, Phoenix would need to challenge the survey's accuracy and validity, not the motivations behind its existence.

**11.** Further, because in litigation a plaintiff bears responsibility for identifying and employing legal theories to defeat any affirmative defenses raised by defendant, the existence of alternative paths to defeat the Act of State defense demonstrates that it would have been unreasonable for Phoenix to fail to press its S–1 claim in reliance

The immateriality of the alleged omissions is also shown by the result in the Florida action where Norsul prevailed on the S–1 issue. While the Florida court's December 1988 Memorandum Opinion is not completely clear on this issue, it appears that the basis for the decision was simply that the 1970 stipulation was a final and binding determination of royalty rights on S–1 production which could not be altered on the basis of any resurvey to which Norsul was not a part. *See* Cmpl't Ex. D at 12–13, 65–69. While the court did note its belief that "the circumstances of the resurvey are not such as to inspire a sufficient level of confidence to bear meaningfully on the compelling effect of the [stipulation]," *id.* at 68–69, the court's holding seems premised on its conclusion that "[t]he relevant agreements and litigation [i.e. the 1970 stipulation] are binding upon the parties to this litigation. Subsequent surveys, *questionable or otherwise, however inspired,* with which plaintiff had no participation will not be considered by the Court as affecting the earlier position of the parties." *Id.* at 12–13 (emphasis added).

The Florida court's decision thus demonstrates that even had an Act of State defense successfully shown that the 1976 survey, conclusively and beyond challenge, established the location of the S–1 well, Texaco's royalty obligations under the 1970 stipulation would nonetheless have continued in force. In other words, Phoenix could have lost the Act of State issue, and still prevailed on its S–1 claim. Misrepresentations concerning the Act of State defense, therefore, were immaterial to Phoenix's decision not to assert an S–1 claim and cannot be relied upon as a basis for its current fraud claim.

### B. *Cross Motions for Summary Adjudication*

Texaco contends that it is entitled to summary judgment on Phoenix's claim for

on Texaco's bald assertion of the doctrine—even had the allegedly omitted facts been revealed.

**12.** The preclusive effect of a prior judgment in a federal action predicated on diversity jurisdiction is governed by federal law. *Johnson v. Eli*

breach of contract because that claim has been merged into and is precluded by the judgment in the 1976 Delaware action. Phoenix responds that the 1976 action did not involve the claim here: that Texaco, improperly relying on the 1976 survey, withheld royalties on the S–1 well.

#### 1. Applicable Standard

■ Res judicata (claim preclusion) "prevents the subsequent litigation of any defense or ground for recovery that was available to the parties in the original action, whether or not it was actually litigated or determined." *Tucker v. Arthur Andersen & Co.,* 646 F.2d 721, 727 (2d Cir. 1981).[12] Res judicata "applies to preclude later litigation if the earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *In Re Teltronics Services, Inc.,* 762 F.2d 185, 190 (2d Cir.1985). Here, only the last element is disputed; the issue presented is whether this action asserts a different "cause of action" from that asserted in the Delaware litigation. If it does, res judicata does not apply. If, on the other hand, this action merely presents a different ground for relief or item of damages for a cause of action included within the Delaware action, that claim should have been litigated there, and is precluded here.

"The Second Circuit has adopted a broad view of what constitutes the same cause of action. Actions need not be identical; they only need be integrally related. In assessing claims, the Court considers several related factors, not one of which is necessarily dispositive, including: (1) whether the same transaction or connected series of transactions is at issue; (2) whether the same evidence is needed to support both claims; and (3) whether the facts essential to the first action were present in the first." ... The crucial element in determining whether a newly

*Lilly and Co.,* 689 F.Supp. 170, 172–73 (W.D.N.Y. 1988) (noting split in circuits and citing Judge Newman's dictum in *Gelb v. Royal Globe Insurance Co.,* 798 F.2d 38, 42 n. 3 (2d Cir.1986)).

asserted claim is based on the same cause of action as a previously decided claim is "the factual predicate of the several claims asserted. For it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies."

*Bin Saud v. Bank of New York*, 734 F.Supp. 628, 632–33 (S.D.N.Y.1990) (quoting *G & T Terminal Packaging Co. v. Consolidated Rail Corp.*, 719 F.Supp. 153, 157 (S.D.N.Y.1989) and *Expert Electric Inc. v. Levine*, 554 F.2d 1227, 1234 (2d Cir.1977)).

### 2. The 1976 Complaint

■ Bearing in mind this "transactional" approach, we turn to an analysis of the 1976 Delaware action to determine whether it shares a "factual predicate" with the present action. This approach is particularly appropriate here because the 1976 complaint (Sherman affid. Ex. A.) does not neatly segregate its factual allegations into individual causes of action each relying on a specific legal theory. Rather the complaint presents a lengthy laundry-list of factual allegations interspersed with some legal theories, and a single catch-all paragraph listing three legal theories which "may, among others, be found applicable by the Court" to the alleged facts. (*Id.* ¶ 73 at 24.) The complaint, drafted in vague and all-inclusive language, does not effectively specify and limit Phoenix's claims.

The following are the relevant passages of the 1976 complaint:

NATURE OF THE ACTION

2. This is an action to recover damages for breach of contract and for the infliction of intentional injury upon plaintiff without justification by defendants.

.     .     .     .     .

FACTS CONSTITUTING THE CLAIM FOR RELIEF

58. Defendants have intentionally, deliberately and willfully breached and violated the July 1965 agreement in material respects and intentionally and without justification injured plaintiff in its business by: ... (b) *failing and refusing to pay the full amount of gross royalty* due plaintiff, as more specifically set forth in Schedule A, ... *through unauthorized deductions* and improper calculations, *including, but not limited to* the following: ... (2) the employment of knowingly false and *erroneous base figures for gross oil production volumes* on which plaintiff's gross royalties were calculated...."

.     .     .     .     .

LEGAL THEORIES OF RELIEF

73. *Without limiting itself thereto,* plaintiff believes that the following legal theories of relief *may, among others,* be found applicable by the Court to the facts which plaintiff will prove at the trial hereof; (a) breach of contract; (b) unjust enrichment; and (c) the intentional infliction of economic injury on plaintiff without justification.

(emphasis added)

The complaint also alleges, in the section captioned "Facts Constituting the Claim for Relief," the existence of the 1970 stipulation and the facts surrounding the dispute leading up to it. *Id.* ¶¶ 15–20 at 7–9. Phoenix now contends that these allegations were directed solely to the tort claim and were included only as part of the alleged pattern of Texaco's bad-faith dealings with Phoenix over the years. (Plaintiff's Rebuttal Mem. at 7.) While this is a fair reading of the complaint, and while the complaint does not specifically allege that royalty payments for S–1 production had been withheld, the broad, inclusive language of the complaint would have permitted Phoenix to obtain relief for the withheld S–1 payments. To the extent that the S–1 claim is premised on breach of the 1965 contract, it clearly falls within the literal scope of ¶ 58, quoted above, as it is a claim for underpayment of royalties due to "the employment of knowingly false and improper base figures for gross oil production volumes on which plaintiff's gross royalties were calculated." Further, ¶ 78 by its own terms declines to impose on the complaint any finite and specified set of legal theories for recovery. Thus Phoenix can not now

claim that the complaint did not encompass a claim for breach of the 1970 stipulation as well as the 1965 contract.[13]

In addition, while the prayer for relief should not be construed as setting out a cause of action, it becomes an important interpretive aid here where the balance of the complaint so vaguely and broadly defines the causes of action being asserted. The Prayer demands

> (1) That defendants be required to *account to plaintiff for all monies* received or retained by them belonging to plaintiff and that defendant pay over *all monies found to be due to plaintiff;* ...
> (3) That this Court award plaintiff damages arising from defendants' breaches of contract in an amount not presently calculable but in any event *not less than* [the amount in Schedule A, which does not reflect the S-1 claim].

*Id.* at 24-25. The Prayer thus indicates that the complaint contemplates recovery of all royalty monies due Phoenix. Had Phoenix eventually decided to press the S-1 claim in the Delaware action, the Prayer certainly would serve as a basis for arguing that recovery on the S-1 claim be permitted under the 1976 complaint.

In sum, while the S-1 issue was not a focus of the 1976 complaint, and the complaint can fairly be read as not explicitly including it, the complaint was so broadly drafted that the S-1 issue clearly falls within its four corners. There can be no dispute that the 1976 complaint would have provided a basis for the award of damages for failure to pay royalties on the S-1 well, as a breach of either the contract or the stipulation. *See Petromanagement Corp. v. Acme-Thomas Joint Venture,* 835 F.2d 1329, 1336 (10th Cir.1988) ("considering the general 'fact pleading' approach of Fed.R. Civ.P. 8," broad allegation included in complaint in first action "was sufficient to allow presentation of alternative theories for the relief sought" and thus barred second action.)

### 3. Splitting Claims for Breach of Contract

■ An additional reason for applying claim preclusion to this action is evident. Because the Delaware complaint unequivocally asserts a cause of action for breach of the 1965 contract, this action—to the extent it asserts a breach of the same contract—is precluded. Where an action includes a cause of action for breach of a particular contract, a second action seeking additional recovery for breach of that same contract is generally considered part of the same factual "transaction" and is precluded, where the grounds for additional recovery might have been included in the first action.[14] *Petromanagement,* 835 F.2d at 1335-37; Restatement (Second) Judgments §§ 24, 25, and § 25 Comment b. Illus. 2 at 210-211.[15]

**13.** *See also* discussion below at 536-37.

**14.** Phoenix concedes that it "became aware of the Shushufindi reductions and could have litigated the Shushufindi royalty issue as a contract claim in the 1976 Delaware action ..." (Plaintiff's Combined Reply and Answering Brief at 24.), and that it knew of the S-1 withholdings "as early as 1977." (Plaintiff's Rebuttal letter of June 19, 1990 at 1). Thus, Phoenix does not contend that it was *unable* to assert the S-1 claim in the Delaware action, but simply that it was not *required* to do so.

**15.** "In deciding whether a prior judgment bars a succeeding claim, district courts in the Second Circuit have adopted the approach of the Restatement (Second) of Judgments. E.g. *Burmah Oil Tankers, Ltd. v. Trisun Tankers, Ltd.,* 687 F.Supp. 897 (S.D.N.Y.1988)." *Crimmins v. Consolidated Edison Co.,* No. 89 Civ. 1124, 1989 WL 99823, 1989 U.S.Dist. LEXIS 9904 (S.D.N.Y. Aug. 23, 1989). *See also e.g., Bin Saud v. Bank of New York,* 734 F.Supp. 628, 633 (S.D.N.Y.1990); *Cullen v. Paine Webber Group,* 689 F.Supp. 269, 278 (S.D.N.Y.1988).

*Commercial Box & Lumber v. Uniroyal, Inc.,* 623 F.2d 371 (5th Cir.1980), cited by plaintiff, permitted two claims on a single contract to be split, but is not applicable here. In *Commercial Box,* the court declined to apply res judicata where the plaintiff's first action sought recovery of losses suffered when defendant changed its point of delivery, and the second sought recovery for defendants' wrongful deduction of discounts to which it was not entitled. The court noted, however, that the delivery claim was the "sole issue raised in the first action. There was no mention of [the issues involved in the second action]. Not only were these issues not raised but they are in no way germane or related to the challenge made in the first suit." Here, in contrast, the unfocused and encompassing nature of Phoenix's 1976 complaint does not permit the conclusion that the S-1 issue was "in no way germane or related to the challenge made

*Buchanan v. General Motors Corp.*, 64 F.Supp. 16 (S.D.N.Y.1946), *aff'd*, 158 F.2d 728 (2d Cir.1947) is closely on point here. In *Buchanan*, plaintiff patent-holders brought an action to recover royalty payments due on the manufacture of patented ice-cube trays. Defendant manufacturer claimed that a particular type of ice-cube tray was not covered by the patent. During discovery in that action, plaintiffs learned that defendants had also been undercounting royalty payments on some of the trays which were unquestionably within the patent, but plaintiffs did not amend their complaint to assert that claim. When plaintiffs tried to assert the undercounting claim in a second action, the Second Circuit held that the action was barred by res judicata. That plaintiffs' original action was for an entirely different aspect of the royalty agreement and involved different factual and legal issues (whether certain ice-trays were within the patent, in the first action, whether the undercounting was justified, in the second), did not prevent the operation of res judicata in *Buchanan*, and it should not here.[16]

### 4. Phoenix's "Different Contract" Contention

■ Phoenix contends, however, that the rule against splitting claims for breach of a single contract is inapplicable here because this action is not based upon the 1965 contract, but upon the 1970 stipulation.[17] (Plaintiff's Combined Reply and Answering Brief at 35.) This contention, however, does not help Phoenix. A claim for the S–1 royalties was certainly available in the 1976 action, as part of the cause of action for breach of the 1965 contract. Thus even if Phoenix's contention is accepted it merely means that Phoenix is now trying to recover for withheld S–1 royalties on a new legal theory. "New legal theories do not amount to a new cause of action so as to defeat the application of the principle of res judicata." *In Re Teltronics Services, Inc.*, 762 F.2d 185, 193 (2d Cir.1985). *See also*, *Weston Funding Corp. v. Lafayette Towers, Inc.*, 550 F.2d 710, 712 (2d Cir.1977) (res judicata applied despite plaintiff's contention that second action was based on a contract, while first action was based on a later memorandum confirming and specifying the obligation).

■ Even without consideration of the "new legal theory" rule, res judicata nevertheless must be applied here because the 1970 stipulation was itself placed into issue by Phoenix early in the 1976 action. It is a plausible reading of the 1976 complaint that although the stipulation was mentioned, no cause of action was asserted under it.[18] The 1977 Moore affidavit, however, (submitted by Phoenix in opposition to a motion to dismiss) which characterizes the S–1 claim as one of the reasons the royalty payments for the first three quarters of 1976 were "substantially deficient," explicitly references and attaches as an exhibit the 1970 stipulation. (Sherman affid. Ex. B at 20–21.) That affidavit, therefore, compels the conclusion that Phoenix intended to assert a cause of action for the S–1 payments *based on the 1970 stipulation* and included it, at least for a time, as part of the 1976 action.[19] Thus, even if the

---

in the [1976] suit," or that other issues were the "sole issue[s] raised" in that action.

**16.** Phoenix relies on *McNellis v. First Federal Savings and Loan*, 364 F.2d 251 (2d Cir.1966), in which the court did not apply a res judicata bar because it found distinct causes of action. That decision, however, relies on a close reading of the particular factual and legal issues involved in the underlying actions (an action for usury and fraudulent conveyance regarding certain payments, and a later action for fraudulent conveyance and violation of the Bankruptcy Act directed at later payments), and is not easily applicable here, particularly in the face of *Buchanan* which involves much more similar facts.

**17.** This assertion is dubious. The complaint in this action states: "Defendants' unilateral exclusion of the Shushufindi No. 1 oil production from their royalty payments to Plaintiffs was and is a breach of the 1970 Stipulation *and the 1965 Contract*." Cmpl't ¶ 50 at 17 (emphasis added).

**18.** Phoenix contends that "the Delaware action was based solely on the 1965 contract...." Combined Reply and Answering Brief at 35.

**19.** There is certainly nothing in the vague and sweeping language of the 1976 complaint which would preclude considering breach of the 1970 stipulation as encompassed within the complaint. Rather, the 1976 complaint is ambigu-

recovery of the S–1 royalties is considered as two different causes of action, depending on whether the claimed breach is of the 1965 or the 1970 agreements, the 1976 action encompassed both possibilities. Any claim for damages for breach of the 1965 contract which might have been brought in the 1976 action is precluded by the judgment in that action. Similarly, the cause of action for breach of the 1970 stipulation became part of the 1976 action no later than the time of Moore's affidavit in 1977. The Delaware judgment thus bars a claim for that cause of action as well.

■ Alternatively, apart from either the 1965 or 1970 agreements, the claim that Texaco was withholding S–1 payments in violation of its obligations under the 1970 stipulation, certainly should have been included as part of Phoenix's Delaware cause of action in *tort* for intentional infliction of economic injury. That "catch-all prima facie tort claim," *Phoenix Canada Oil Co. v. Texaco, Inc.*, 560 F.Supp. 1372, 1377 (D.Del.1983) was made up of a lengthy series of allegedly wrongful actions taken by Texaco in an alleged effort to destroy Phoenix. The "predicate acts" alleged spanned a period from 1969 to 1977. *See id.* at 1387. While that cause of action was ultimately dismissed on statute of limitations grounds, *id.*, there is no plausible reason why Texaco's 1976 decision to withhold S–1 payments, assertedly in violation of the 1970 stipulation, should not be considered part of the claimed pattern of abuse and included in the "catch-all" cause of action. As an alternative ground for our holding, we therefore find that Phoenix's S–1 claim has been improperly split from its 1976 cause of action for tort.

### 5. Preclusion of Claims for Future Installments

■ Phoenix contends, finally, that even if res judicata applies to bar its claim for withheld S–1 royalty payments, the bar is applicable only to those payments which became due on or before the date the Delaware action was filed. Phoenix contends that because each failure by Texaco to make a quarterly royalty payment constitutes a new breach of the contract and/or stipulation, an action filed in 1976 was not obligated to include claims for those breaches occurring after that date.

This contention is meritless. We have held above that Phoenix should have included its claim for S–1 royalty payments in the 1976 action. ·Had it done so, and prevailed, the relief it obtained would have, and certainly should have, included declaratory or injunctive relief covering future royalty periods. *See Gasbarra v. Park–Ohio Industries, Inc.*, 655 F.2d 119, 123 (7th Cir.1981). Even aside from declaratory or injunctive relief, a ruling in favor of Phoenix on the S–1 issue would have made Phoenix the automatic victor on any future action against Texaco for recovery of any particular S–1 royalty installment. *Id.* Had the S–1 claim failed in the 1976 litigation, that ruling would have barred Phoenix, via collateral estoppel, from relitigating the issue of Texaco's liability for S–1 payments at any point in the future. Either way, had Phoenix pressed its S–1 claim in the 1976 action, as it should have, the Delaware court's decision would have governed the parties' rights for future royalty periods. Phoenix's failure to include its S–1 claim in the 1976 action thus bars it for all time from reasserting that claim.[20]

ous on whether the 1970 stipulation is being sued upon, and the Moore affidavit served to clarify the ambiguity. Thus, although it would have been preferable, as a matter of clarity, for Phoenix to have amended the 1976 complaint to state explicitly a cause of action for breach of the 1970 stipulation, the original 1976 complaint provided an adequate basis for judgment for Phoenix for breach of the 1970 stipulation.

20. Plaintiff cites to *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1275–76 (2d Cir.1974) (Friendly, J.) for the proposition that "[a]pplying res judicata to claims involving continuing conduct over a long period of time presents difficulties at best," especially when an "absence of an actual prior adjudication has deprived the court of the more precise tool of issue preclusion...." *Id.* at 1275. *Jean Patou,* however explicitly refuses to lay out any blanket rule for the application of res judicata in such a situation. The court noted that "[t]his *may* be a case in which a rigid application of res judicata is not warranted, even though it falls within the technical reach of the doctrine," *id.* at 1275 (emphasis added), and

In conclusion, the Court notes that the Delaware action encompassed some eleven years of litigation (not counting appeals), during which Phoenix on several occasions made attempts, some successful, to include for trial various issues which were not clear on the face of the 1976 complaint or involved post–1976 facts. *See generally, Phoenix Canada Oil Co. v. Texaco, Inc.,* 658 F.Supp. 1061, 1063–64, 1082 (D.Del. 1987). By its conduct, then, Phoenix demonstrated an intent to resolve all of its disputes with Texaco arising out of the Ecuadorian oil operations and the royalty arrangement in that one action.[21] It must be assumed that Phoenix's decision not to assert particular claims reflected a strategic choice of which claims were worth litigating.[22] Further, sensible use of the limited resources of the court system demanded that the extensive litigation in Delaware encompass all facets of the dispute. That Norsul finally prevailed on its S–1 claim is doubtless cause for regret on Phoenix's part, but the wisdom borne of hindsight does not give Phoenix the right to shift the burden of its miscalculation to defendant and the courts and demand that they sponsor a second round of litigation.

## III. CONCLUSION

For the foregoing reasons, Phoenix's second claim for relief, for fraud, is dismissed with prejudice. Texaco is entitled to judgment on the first and third claims for re-

lief, for breach of contract and declaratory judgment.

The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

---

21. As the Third Circuit noted on appeal of the Delaware action,

> [f]or ten years, the district court wrestled with this case, battling a seemingly never-ending barrage of paper. In *Phoenix II,* the court characterized the pretrial condition of this case as a "hopelessly confused morass." ... 560 F.Supp. 1372, 1390 (D.Del.1983) (*Phoenix II*). By that time, seven years after the suit was filed, the court justifiably could expect Phoenix to have clarified its position and finally have settled on its legal theory.... Phoenix never specified the elements of the claims under Ecuadorian law, nor did it explain how its allegations conformed to those elements.

*Phoenix Canada Oil Co. v. Texaco, Inc.,* 842 F.2d 1466, 1473 (3d Cir.1988).

22. In light of our discussion of the fraud claim, *supra,* Phoenix's explanation—that it was fraudulently misled by Texaco into not asserting the S–1 claim—is untenable. Phoenix's repeated attempts to carve out an exception to the relevant precedents with that contention are similarly unavailing.

remanded for consideration of several factors, including the "public interest considerations weighing in favor of or against the application of res judicata." *Id.* Judge Friendly noted that "the doctrine [of res judicata] is intended to serve the aims of fairness and efficient judicial administration" and it therefore "need not be applied mechanically." *Id.* We heed Judge Friendly's advice here, and do not apply the doctrine "mechanically," but rather because its application in this case is formally proper and will promote "fairness and efficient judicial administration."